# In the United States Court of Federal Claims

FRAWNER CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 22-cv-0078

Filed Under Seal: July 29, 2022

Publication: August 8, 2022[1]

*Edward T. DeLisle*, Offit Kurman, Plymouth Meeting, Pennsylvania for Plaintiff.  With him on the briefs are *Adrés M. Vera*, Offit Kurman, P.A., Bethesda, Maryland, and *James C. Dougherty*, Offit Kurman, P.A., Vienna, Virginia.

*David M. Kerr*, United States Department of Justice, Civil Division, Commercial Litigation, Washington, District of Columbia for Defendant.  With him on the briefs are *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division; *Patricia M. McCarthy*, Director, Commercial Litigation; *Deborah A. Bynum*, Assistant Director, Commercial Litigation; and *Nicholas T. Iliff, Jr.*, United States Air Force, Commercial Litigation Field Support Center.

## MEMORANDUM AND ORDER

Located on the edge of Anchorage, Alaska, "amid picturesque, majestic, snow-capped mountains, lakes, rivers and glaciers," Joint Base Elmendorf-Richardson (JBER) spans nearly 13,130 square acres, making it the largest military installation in Alaska.[2]  JBER is "one of the

---

[1] This Memorandum and Order was filed under seal in accordance with the Protective Order entered in this case (ECF No. 15) and was publicly reissued after incorporating all redactions proposed by the parties.  (ECF No. 38.)  The sealed and public versions of this Memorandum and Order are substantively identical, except for the addition of the publication date and this footnote.

[2]  https://installations.militaryonesource.mil/in-depth-overview/joint-base-elmendorf-richardson-jber (last viewed June 23, 2022); https://www.pacaf.af.mil/Info/Fact-Sheets/Display/Article/909896/elmendorf-air-force-base/ (last viewed June 23, 2022).

most prominent and active Air Force bases in the United States," housing elite units such as the United States Air Force's 3rd Wing, whose mission is to "support and defend U.S. interests in the Asia Pacific region and around the world."[3]   As a large military installation, JBER requires continued maintenance to keep its "more than 800 buildings, two runways and more than 150 miles of roads" in pristine condition.[4]  But Alaska is different than the lower forty-eight.  Situated above the 50th and 60th parallels, Alaska experiences "severe weather conditions" between October and March, narrowing the window for performing such maintenance.[5]

At issue in this protest are contract awards issued to third parties to perform maintenance and repair tasks at JBER.  The protestor, Frawner Corporation (Frawner), a "small business full-service general contractor specializing in general, civil, and industrial construction services," brings this post-award bid protest challenging the decision of Defendant United States, acting through the U.S. Department of the Air Force (Air Force), "not to award Frawner an indefinite-delivery/indefinite-quantity ("IDIQ") contract" under solicitation number FA500021R0001 (Solicitation).  Complaint (ECF No. 1) (Compl.) ¶ 1, 3.  In its Complaint, Frawner argues that the Air Force arbitrarily and capriciously (i) "applied numerous unstated evaluation criteria that could

---

[3]  https://installations.militaryonesource.mil/in-depth-overview/joint-base-elmendorf-richardson-jber (last viewed June 23, 2022); https://www.pacaf.af.mil/Info/Fact-Sheets/Display/Article/909896/elmendorf-air-force-base/ (last viewed June 23, 2022); https://www.jber.jb.mil/Units/Air-Force/ (last viewed June 23, 2022).

[4]   https://www.pacaf.af.mil/Info/Fact-Sheets/Display/Article/909896/elmendorf-air-force-base/ (last viewed June 23, 2022).

[5]  https://installations.militaryonesource.mil/in-depth-overview/joint-base-elmendorf-richardson-jber (last viewed June 23, 2022); *see also* Transcript of Oral Argument, dated March 17, 2022 (ECF No. 30) (Tr. Oral Arg.) at 60:10-15 ("[T]hey do have a very -- as Your Honor knows, a very short window of time to get these projects done [as] [a] lot of them are out of doors or require, you know, moving things around outdoors.").

not be reasonably gleaned from the Solicitation but had a major impact on the ultimate award,"[6] and (ii) conducted a best value analysis that did not adequately consider price tradeoffs. *Id.* ¶¶ 62, 82-89. Frawner seeks (1) an order holding unlawful the Air Force's failure to award Frawner the contract, (2) an injunction barring the Air Force from "awarding and/or proceeding with any Award (including any Task Order Award) under the Solicitation pending reevaluation and a new award decision," (3) an order directing the Air Force to "reevaluate proposals or, in the alternative, resolicit proposals for this procurement, and make a new best value decision," and (4) its attorneys' fees and costs associated with this action.[7] *Id.* at 34.

During the pendency of this litigation, Defendant consented to a voluntary stay of its award through March 31, 2022. *See* January 31, 2022, Joint Status Report (ECF No. 16) at 2. The parties subsequently filed motions for judgment on the administrative record, and on March 17, 2022, this Court conducted oral argument on the pending motions. *See* Transcript of Oral Argument, dated March 17, 2022 (ECF No. 30) (Tr. Oral Arg.); Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 24) (Pl.'s MJAR); Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 27) (Def.'s Cross-MJAR). Due to the "fast approaching start to the Alaskan construction season[,] the expiry of [D]efendant's voluntary stay, . . . and [a]s all parties agreed," the Court issued a decision on the record on March 31, 2022. Transcript of Joint Status Conference dated March 31, 2022 (ECF No. 35) at 3:7-16. Accordingly, as reflected on the

---

[6] These allegedly unstated criteria include: (1) assigning sub-factor ratings to a past project's "scope, magnitude [of effort], and complexity" in evaluating its Relevance; (2) determining Relevance ratings based on "the lowest adjectival rating" from the three sub-factor ratings; (3) examining each project individually, rather than reviewing projects holistically, under the "scope" sub-factor of Relevance; and (4) instituting "the mechanical application of the unstated $2 Million maximum value for Past Performance projects." Compl. ¶¶ 63-69.

[7] Plaintiff does not address fees or costs in its Motion for Judgment on the Administrative Record. *See* Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 24).

record and in this Court's May 31, 2022 Order (ECF No. 33), and for the reasons explained below,

this Court **GRANTS in part** Plaintiff's Motion for Judgment on the Administrative Record (ECF

No. 24) and **DENIES in part** Defendant's Cross-Motion for Judgment on the Administrative

Record (ECF No. 27).

BACKGROUND[8]

The current protest centers on "a contracting program designed to support the Air Force's

673d Civil Engineer Group in the performance of a broad range of construction and facilities

maintenance activities" at Joint Base Elmendorf–Richardson in Anchorage, Alaska.  Compl. ¶ 9.

While the JBER contracting program involves two government contracts – "a larger unrestricted

multiple-award design-build contract set-aside for businesses in the Small Business

Administration's 8(a) Business Development Program (the 'DB-MACC') and the [Multiple

Award Construction Contract, referred to as the] Mini-MACC" involving "less-complex" and

"'minimal' repair and alternation projects" – only the Mini-MACC contracts are at issue in this

protest. *Id.* ¶¶ 9-10.  As described below in further detail, Frawner filed the present action after

the Air Force declined to award it one of the Mini-MACCs.

I.   Solicitation

The Solicitation for the Mini-MACC contracts was issued on May 3, 2021.  *See, e.g.*, Tab

8 (Solicitation No. FA500021R0001 (May 3, 2021)); Tab 58 (Executed Contracts (December 28,

2021)) at Administrative Record (AR) 3291 (noting "DATE ISSUED 5/3/2021").  Bids were

originally due by June 1, 2021, at 2:00 p.m. Alaska Daylight Time.  Tab 8 at AR 320.  Amendment

---

[8] This section contains the Court's findings of fact derived from the Administrative Record (AR).
The AR is contained in ECF No. 23.  Documents within the Administrative Record are divided
into "Tabs."  An index of the Administrative Record's tabs can be found at ECF No. 23-1.

0005 to the Solicitation extended that deadline to June 14, 2021.[9]  Tab 13 (Amendment 0005 (June 6, 2020)) at AR 835.  The Air Force anticipated awarding "up to 4" Mini-MACC contracts that would satisfy its construction needs at JBER on an "as needed basis."  Tab 8 at AR 320.  While the DB-MACC primarily fulfilled task orders "requiring more than incidental design or the services of a registered architect or professional engineer," the Mini-MACC complemented the DB-MACC by satisfying JBER's "small project" needs.  *Id*. at AR 324.  As specified in the Solicitation, the Mini-MACC's tasks—which are fulfilled by the Mini-MACC contractors — would consist of "multiple disciplines in general construction categories of on-base facilities for JBER."  *Id.*  Contractors fulfilling the Mini-MACC's requirements were expected to have the design and engineering expertise of a "general construction contractor."  *Id.*

The Mini-MACC awards are indefinite delivery/indefinite quantity (IDIQ) contracts governed under FAR "Part 15, Department of Defense (DoD) FAR Supplement Procedures, Guidance and Information Subpart 215.3, and Air Force FAR Supplement (AFFARS) Mandatory Procedure (MP) 5315.3."  Tab 8 at AR 323; Tab 7 (Source Selection Plan (June 4, 2021)) at AR 317.  As defined by the General Services Administration (GSA), IDIQ contracts "provide for an indefinite quantity of services for a fixed time [and] are used when [an agency] can't determine, above a specified minimum, the precise quantities of supplies or services that the government will

---

[9] Between May 3, 2021 and June 7, 2021, the Air Force issued five other amendments to the Solicitation that did not substantively alter the evaluation process as it relates to this action.  *See* Tab 41 (Source Selection Evaluation Board Report (December 8, 2021)) at AR 2565 (Amendment 0001 – "Updated site visit date and building number for the seed project"; Amendment 0002 – "1st proposal due date extension, remove FAR clause, removed mission essential contractor services plan, and provide site visit sign in sheet"; Amendment 0003 – "Responded to contractor questions 1 through 40"; Amendment 0004 – "Responded to contractor questions 41-206, revised SOW, Spec and drawings for Seed Project"; and Amendment 0006 – "Changed Schedule B unit of issue from Lot to Project"); *see also* Tab 9 (Amendment 0001 (May 3, 2021)); Tab 10 (Amendment 0002 (May 25, 2021)); Tab 11 (Amendment 0003 (May 25, 2021)); Tab 12 (Amendment 0004 (May 27, 2021)); Tab 14 (Amendment 0006 (June 6, 2020))).

require during the contract period." U.S. General Services Administration, "Indefinite Delivery, Indefinite Quantity Contracts," https://www.gsa.gov/buying-selling/new-to-gsa-acquisitions/how-to-sell-to-the-government/indefinite-delivery-indefinite-quantity-contracts (last viewed June 27, 2022).

While Mini-MACC awardees would not know the Air Force's precise construction needs during the lifetime of the procurement, the Solicitation provided estimates for compensation. First, each Mini-MACC contract's value was estimated between $2,000 and $99,999,999 over the five-year base period given by the Solicitation. Tab 8 at AR 320. Second, individual task orders under the IDIQ would have a minimum value of $2,000 and a maximum value of $2,000,000 — "with the majority expected to be less than $500,000." *Id*. at AR 323, AR 395. Third, in addition to the IDIQ contracts, the Solicitation also included an award for a seed project, FXSB 17-1110, Repair BLDG. 5327 Exterior, JBER, AK, which had an estimated value of $500,000 to $1,000,000. Tab 8 at AR 320; Tab 9 at AR 694 (describing the seed project). As explained in more detail below, consideration of the seed project award was evaluated concurrently with the IDIQ contract awards and was used as a measure for evaluating Price for both. *See infra* Background Section I(B)(i).

A. Off-Ramp/On-Ramp Award Procedures

Although the Solicitation limited the number of initial Mini-MACC IDIQ contracts to "up to four," that pool of awardees could expand or contract if the Air Force triggered certain off-ramp/on-ramp procedures. Tab 8 at AR 336-37. In conjunction with selecting "up to four" IDIQ award winners, the Air Force created a "reserve vendor pool of up to ten (10) contractors" of otherwise eligible offerors who were not chosen for one of the awards. *Id*. at AR 336. Those reserve vendors "may be offered an opportunity, within the ordering period of this contract, to receive an IDIQ award and be authorized to participate in task order[s]." *Id.* The Air Force could

"off-ramp" one of the four awardees for reasons such as "[c]onvenience of the Government," and it could "on-ramp" contractors from the reserve pool if "in the Government's best interest."  *Id.* In the event the agency chose to "on-ramp" bidders, it would "start[] at the highest ranked On-Ramp contractor in the [reserve] pool."  *Id.*  An "on-ramped" offeror would then "become an additional Mini-MACC awardee."  Tab 8 at AR 337.  The Air Force was not required to "off-ramp" one of the four original awardees prior to "on-ramping" an offeror from the reserve vendor pool.  *Id.* at AR 336-37.

B. Basis of Evaluation

This procurement was a "best value" procurement conducted based on a "competitive subjective tradeoff" of (1) Price and (2) Past Performance, with the latter "significantly more important" than the former.  *Id.* at AR 389.  The Air Force only considered "offerors whose proposals conform[ed] to all required terms and conditions, include[ed] all required representations and certifications, [met] all requirements set forth in the RFP[,] and also provide[d] the best value to the Government."  *Id.*

The Solicitation permitted the Air Force to award a contract to another offeror that did not submit the lowest price "if the difference in the Past Performance Confidence Rating of another offeror with [a] higher price justifie[d] the higher price premium."  *Id.* at AR 391.  However, such justification had to be based on "an integrated assessment best value award decision using the [total evaluated price (TEP)] and the Past Performance Confidence Rating."  *Id.*  At the final stage of its analysis, "[o]nce selected awardees [had] been identified for the IDIQ, the Government . . . rank[ed] each selected awardee by price from lowest to highest for the seed project (Attachment J-4) and award[ed] the seed project to the lowest offeror."  *Id.*  Accordingly, consideration for the

IDIQ awards and the seed project contract occurred concurrently.  *Id.*  The agency's evaluation of Price and Past Performance are explained below.

i.   Factor 1: Price

Price was evaluated based on offerors' proposed pricing for the seed project.  Tab 8 at AR 389.  Offerors submitted their Attachment J-4 Price Schedule, which was then used as the offeror's total evaluated price (TEP) for its bid.  *Id.*  While the Solicitation required the Air Force to "evaluate the fairness and reasonableness of the Total Evaluated Price (TEP) for all offerors," the Air Force retained the discretion to choose its "price analysis technique[] and procedure[]."  *Id.* The Solicitation lists "examples" of such techniques:

(a) Price analysis: The process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit.
(b) Comparison of proposed prices received in response to the solicitation. Normally, adequate price competition establishes price reasonableness.
(c) Comparison of previously proposed prices and previous Government contract prices with current proposed prices for the same or similar effort.

*Id.*  In addition to a price reasonableness analysis, the agency could — but was not required to — conduct a price realism analysis to ensure that "the project [could] realistically be completed within the proposed constraints."  *Id.*  As a result of any price realism analysis, the Air Force would disregard price proposals that it found "unrealistically low."  *Id.*

ii.   Factor 2: Past Performance

Past Performance was evaluated to "assess the degree of confidence the Government ha[d] in the offeror's ability to meet the [S]olicitation requirements based on the offeror's demonstrated record of performance."  Tab 8 at AR 390.  The Air Force could evaluate up to five past projects submitted by an offeror.  *Id*. at AR 379.  In assessing Past Performance, the Air Force could "give greater consideration to information on those contracts deemed most relevant to the effort described in [the] [S]olicitation."  *Id*. at AR 391.

The Solicitation indicated that "[r]elevant past performance information for the five (5) completed projects must demonstrate minimum design/build and build experience with multiple disciplines." *Id*. at AR 380. While "[n]ot all projects are required to have design/build or multiple-discipline aspects," the Solicitation noted that "this experience must be represented within the total of submitted contracts/projects." *Id*. at AR 380-81. The Solicitation listed applicable disciplinary skills as follows:

    (1) Demolition
    (2) Painting
    (3) Carpentry
    (4) Mechanical/HVAC/Plumbing
    (5) Fire Sprinkler/Fire Alarm Systems
    (6) Electrical
    (7) Structural
    (8) Minimal Design as specified in Mini-MACC SOW 01000, para. 1.3
    (9) Hazmat/Asbestos/Abatement
    (10) Roofing/Insulation/Thermal & Moisture Control
    (11) Civil work

*Id*. at AR 380.

### 1.   Past Performance Documentation

Offerors were required to submit the following documentation along with each past project: a (1) Past Performance Questionnaire, (2) Past Performance Questionnaire Cover Letter, (3) Past Performance Supplement Worksheet, and (4) Past Performance Information Document. Tab 8 at AR 379.

*Past Performance Questionnaires (PPQs) and Cover Letter*. PPQs, also referenced as Attachment J-7 to the Solicitation, are completed by references who worked with the offeror on one of its past projects. *Id*. at AR 379. The Solicitation "requires the offeror send out a PPQ to each [reference] identified in the Past Performance Proposal." *Id.* The PPQ contains fifteen multiple choice questions in which the reference is asked to "answer all questions by checking

only one (1) response per question, [while placing] additional information . . . in the space provided." Tab 8 at AR 613-18.  In addition to the fifteen multiple choice questions, the PPQ also requests the reference indicate, *inter alia*, the project's (i) "original" and "final" award amount, (ii) status as "active" or "100% complete," (iii) "completion date" or "expected completion date," and (iv) inclusion of the eleven disciplines (*i.e.*, Demolition) listed in the Solicitation.  *Id.* at AR 614; *see supra* p. 9.  After completing the PPQ, the reference was required to email the PPQ directly to Air Force personnel Donald Dougherty and John Jeffrey, along with a PPQ Cover Letter, also referenced as Attachment J-6 to the Solicitation, indicating whether the reference would recommend the offeror for the procurement.  Tab 8 at AR 379.

*Past Performance Supplement Worksheet*.  The Past Performance Supplement Worksheet, also referenced as Attachment J-8 to the Solicitation, is a Microsoft Excel spreadsheet completed by the offeror.  The offeror must list its submitted projects (five maximum) indicating each past project's (i) "[p]eriod of [p]erformance," (ii) "[p]rice," and (iii) inclusion of any of the eleven disciplines (*i.e.*, Demolition) listed in the Solicitation.  *Id.* at AR 619; *see supra* p. 9.

*Past Performance Information Document*.  Offerors were required to provide a "[s]ummary of each contract/project" that included the following:

> (a) Company/Division name[,] (b) Contract/Project Title[,] (c) Contract/Project Location[,] (d) Contracting Agency/Customer[,] (e) Contract Number[,] (f) Contract Dollar Value[,] (g) Period of Performance[,] (h) Verified, up-to-date name, mailing and e-mail addresses, and telephone number of the contracting officer (Point-of-Contact)[,] (i) Comments regarding compliance with contract terms and conditions (e.g. scope, cost and period of performance, labor and statutory requirements)[,] (j) Descri[ption] [of] any known performance deemed unacceptable by the customer, or not in accordance with the contract terms and conditions [and] description of how it was resolved[,] (k) [S]ummary description of the project scope of work [including] (i) rationale supporting your assertion of relevance and identify aspects (scope, magnitude of effort, and complexity) of the contracts deemed relevant and how they relate to the proposed effort [and] (ii) [d]emonstration of performance of minimal design/build[,] [d]emonstration of management of multiple discipline construction projects[,] [d]emonstration of

meeting project cost, quality standards and schedule, (l) Discussion of noteworthy aspects and challenges[,] [and] (m) Pictures of projects may be included, if desired.

*Id*. at AR 379-80.

### 2.   Past Performance Analysis

Based on the documentation provided by the offerors and their references, each of the five submitted projects were assessed for "recency and relevancy."  *Id*. at AR 390.  Those projects deemed "Recent" and "Relevant" were then assessed for Quality.  *Id.*  The Solicitation defined Recent projects as "those efforts completed for any customer(s) within the last three (3) years prior to the issuance date of the [S]olicitation."  *Id.*  The Solicitation noted that Relevant projects would be "assessed based upon the extent to which past performance is of similar scope, magnitude and complexity to the type of projects exemplified by the seed project for this [S]olicitation."  *Id.*  The Solicitation further noted that "[t]o be considered relevant, greater consideration [would] be given to submitted contracts demonstrating work completed above the 60th parallel in a seismically active area (e.g. Alaska)."  Tab 8 at AR 380.  Further, "[c]omplexity and scope [could] be determined by viewing the previous contracts" based on the presence of the eleven disciplines listed in the Solicitation.  *Id*. at AR 381.  The Solicitation provided the following Relevancy adjectival ratings and accompanying definitions:

Rating: Very Relevant. Definition: Present/past performance involved essentially the same scope and magnitude of effort and complexities this solicitation requires.

Rating: Relevant. Definition: Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires.

Rating: Somewhat Relevant. Definition: Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires.

Rating: Not Relevant. Definition: Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires.

11

*Id*. at AR 390.  The Solicitation warned that only those past projects deemed "[R]ecent, [R]elevant and [S]omewhat [R]elevant" would assessed for Quality.  *Id.*  Accordingly, a "Not Recent" or "Not Relevant" project would not receive further consideration for purposes of Past Performance analysis.  *Id.*

Quality was assessed "with a focus on quality control, timely performance, effectiveness of management, and regulatory compliance."  *Id.*  After the Air Force completed its (i) Recency, (ii) Relevancy, and, if applicable, (iii) Quality assessment for up to five of an offeror's submitted projects, each offeror was then "assigned a single past performance confidence rating."  Tab 8 at AR 391.  The Past Performance confidence ratings and their accompanying definitions were as follows:

> Rating:  SUBSTANTIAL CONFIDENCE.  Description: Based on the offeror's recent/relevant performance record, the government has a high expectation that the offeror will successfully perform the required effort.

> Rating:  SATISFACTORY CONFIDENCE.  Description: Based on the offeror's recent/relevant performance record, the government has a reasonable expectation that the offeror will successfully perform the required effort.

> Rating: NEUTRAL CONFIDENCE.  Description: No recent/relevant performance is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance.

> Rating: LIMITED CONFIDENCE.  Description: Based on the offeror's recent/relevant performance record, the government has a low expectation that the offeror will successfully perform the required effort.

> Rating: NO CONFIDENCE.  Description: Based on the offeror's recent/relevant performance record, the government has no expectation that the offeror will successfully perform the required effort.

*Id.*

II.     The Air Force's Analysis and Award Decisions

The Air Force received thirteen timely proposals from the following entities: Ahtna Global, LLC (Ahtna); AMES 1, LLC (Ames 1); Ancor, Inc. (Ancor); Eklutna Construction & Maintenance, LLC (Eklutna); Frawner Corporation (Frawner); HPM, Inc. (HPM); Iyabak Construction, LLC (Iyabak); Nodak Electric & Construction, Inc. (Nodak); Orion Construction, Inc. (Orion); SD Construction, LLC (SD Construction); Tikigaq Federal Services, LLC (Tikigaq); Tyonek Construction Services, LLC (Tyonek); and White Mountain Construction, LLC (White Mountain Construction).[10]   *See* Tab 41 (Source Selection Evaluation Board Report (December 8, 2021)) at AR 2566.  The Air Force's review proceeded in two steps.  First, its Source Selection Evaluation Board (SSEB) issued a report recommending awardees based on analyses performed by its "pricing and past performance evaluation teams."  *Id.* at AR 2565-66.  Second, its Source Selection Authority (SSA) reviewed the SSEB's report and made the ultimate award decisions. *See* Tab 44 (Source Selection Decision (December 20, 2021)) at AR 2704-11.  Each entity's analysis and report is summarized in turn.

A.   The Source Selection Evaluation Board (SSEB) Report

On December 8, 2021, the SSEB issued a report analyzing the offerors and detailing its awardee recommendations to the SSA.  Tab 41 at AR 2652.  The SSEB's analysis and award recommendations are detailed below.

i.   Factor 1: Price

In evaluating Price, the Air Force's price evaluation team "reviewed each offeror's Attachment [J-]4 Price Schedule for the seed project to calculate each offeror's [Total Evaluated

---

[10] Defendant did not evaluate two additional offerors — ███████████████████████████ ████████████████.  Tab 41 at AR 2566-67.  ███████ submitted its proposal late, and the Air Force never received ██████ proposal.  *Id.*

Price (TEP)]."  Tab 41 at AR 2566.  Based on its review, the price evaluation team determined

that it was unnecessary to conduct a price realism analysis for this procurement.  *Id.*  Next, in

assessing price reasonableness, the SSEB employed "the technique outlined in FAR 15.404-

1(b)(2)(i)," by comparing proposed prices received "to establish a fair and reasonable price."  *Id.*

The SSEB went a step further to "assist in a more thorough analysis of price" by calculating the

average of all TEPs and comparing each price "to the mean of all evaluated proposals."  *Id.*   In its

documentation of each offeror's Price assessment, the SSEB indicated each offeror's (i) total

evaluated price, (ii) "[m]ean [p]riced [p]roposal," (iii) "[d]ifference from [m]ean [p]riced

proposal" in dollars, and (iv) "[d]ifference from [m]ean [p]riced [p]roposal" by percentage.  *See,*

*e.g.*, Tab 41 at AR 2613.

 The SSEB determined that price competition in this procurement — among thirteen bidders

— was a factor that ensured reasonable prices for the Air Force:

> In this case, it is apparent that two or more responsible offerors, competing
> independently, submitted priced offers that satisfy the Government's expressed
> requirement.  Therefore, price competition can be used as the basis to establish a
> fair and reasonable price.

*Id*. at AR 2568.  However, the Air Force's analysis did not end there.  It noted an expectation of

price variation in the proposals because "in the Anchorage market individual project costs vary,

sometimes quite significantly, between offerors on competitive proposals."  *Id.*  The SSEB

provided numerous reasons for the pricing disparity in Anchorage including: "some contractors

have their own workforce for certain disciplines, some own equipment for certain project types vs.

having to lease equipment, better relationships with limited sub-contractor marketplace, etc."  *Id.*

Finally, in reference to the two highest priced bids (Tyonek and Eklutna), the SSEB noted that

"although th[ese] offeror[s'] price[s] [are] substantially higher than other offerors that does not

mean [these] offer[s] [are] not fair and reasonable.  [Instead,] their price is still considered [to] be

within a reasonable range given the extreme variability in prices seen in the past year." Tab 41 at AR 2582 (Eklutna), AR 2602 (Tyonek).

      ii.  Factor 2: Past Performance

The past performance evaluation team assessed Past Performance based on the required documentation provided by offerors and their references as well as "information obtained [in accordance with] FAR Part 42.1503(g), and . . . any other information independently obtained by the Government." *Id.* at AR 2566; *see supra* Background Section I(B)(ii)(1). While the Solicitation did not specify how "scope, magnitude of effort, and complexity" would be evaluated, the SSEB evaluated (i) "scope," (ii) "magnitude," and (iii) "complexity" separately as independent sub-factors of Relevance, with each prong receiving its own adjectival sub-rating reflecting one of the overall Relevance adjectival ratings. *See* Tab 41. The SSEB then applied the lowest of the three adjectival sub-ratings as the overall Relevance rating for that project. *Id.* The SSEB evaluated each Relevance sub-factor as follows:

*Scope.* The SSEB assessed "scope" by determining a past project's inclusion of the eleven disciplines stated in the Solicitation.[11] *See, e.g.*, Tab 41 at AR 2569; *see also supra* p. 9. Past projects demonstrating three or more of the eleven disciplines received a "Very Relevant" "scope" sub-rating. *See generally* Tab 41 (assigning a "Very Relevant" "scope" sub-rating for past projects with three through eleven of eleven disciplines listed in the Solicitation). Past projects containing fewer than three disciplines received lower "scope" sub-ratings. *See, e.g.*, *id.* at AR 2593 (assigning ████████████████████████ project a "Relevant" "scope" sub-rating where it demonstrated two of the eleven disciplines listed in the Solicitation).

---

[11] While the Solicitation did not specify how its "multiple discipline[ary]" requirement could be met, the SSEB analyzed those "disciplines" in its "scope" sub-factor analysis. *See* Tab 8 at AR 380-81.

*Magnitude.*   In evaluating "magnitude," the SSEB assessed whether a past project was "representative of the task order values projected for the Mini-MACC." *See, e.g.*, *id*. at AR 2569. In doing so, it assigned "Very Relevant" sub-ratings to past projects valued less than $2 million and "Not Relevant" sub-ratings to past projects valued more than $2 million. *Compare id*. at AR 2646 ████████████████████████████████████████████

████████████  *with id*. at AR 2644 ███████████████████████████████████

████████████████████████████████████. For example, "two (2) [past] projects submitted [by Frawner] were [deemed] Not Relevant, [because] each exceeded the [$2 million] maximum value of the task order under the Mini MACC, and the [S]olicitation stated the maximum value of a task order under the Mini MACC is $2M." Tab 41 at AR 2647.

*Complexity.*   A past project's "complexity" sub-rating hinged on whether it was performed "above the 60th parallel in a seismically active area." *See, e.g.*, *id*. at AR 2644.  The SSEB assigned "Very Relevant" "complexity" sub-ratings to projects performed above the 60th parallel and in a seismically active area. *Id.* ██████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████. If a past project was performed below the 60th parallel or was not in a seismically active area, it received a lower "complexity" sub-rating. *See, e.g.*, *id*. at AR 2622 (assigning "Relevant" "complexity" sub-rating to █████████████████████████

█████████████ project "performed in Glacier Bay, AK, which is below the 60th parallel and in a seismically active area").

In assessing Recency, the SSEB mistakenly noted that projects "completed within three (3) years of the [S]olicitation date of April 30, 2021" were Recent. *See, e.g.*, *id*. at AR 2568. Defendant's counsel noted at oral argument that Defendant believes this was a typographical error

in the SSEB's report as the Solicitation was issued on May 3, 2021, not on April 30, 2021.  Oral

Arg. Tr. at 55:9-14; *see also* AR 3291 (noting "DATE ISSUED 5/3/2021").

Next, for past projects deemed Relevant and Recent, the SSEB assigned a "general

[Q]uality rating for each PPQ . . . based on the answers to the questions in the PPQ and narratives,

if provided."  Tab 41 at 2566; *see also* Tab 41 at AR 2580 (Ames 1's F-35A Aircraft Maintenance

Unit Administrative Facility project not assessed for Quality after receiving a "Not Relevant"

Relevance rating).  The SSEB's Quality ratings included: "Exceptional," "Very Good," "Not

Received," and "Not Rated."  *See generally* Tab 41.  Neither the Solicitation nor the SSEB's report

provide separate definitions for these ratings.  *Id.*; *see also* Tab 8.

Finally, consistent with the definitions provided in the Solicitation, each offeror received

an overall Past Performance rating based on the SSEB's confidence in the offeror's ability "to

perform the work under this Mini-MACC program."  *See, e.g.*, Tab 41 at AR 2647; *see also* Tab

8 at AR 391 (Past Performance confidence rating definitions).  The SSEB assigned "Substantial

Confidence" ratings to those offerors "found to have performed work comparable to the scope,

magnitude, and complexity associated with Mini-MACC task orders, and based upon evaluation

of PPQs and CPARs [that] obtained Very Good to Exceptional [Quality] ratings."  Tab 41 at AR

2649.

### iii.   Tradeoff Analysis and Recommendation

After concluding its Price and Past Performance review, the SSEB ranked offerors based

on the "past performance confidence rating of the Offerors['] ability to perform the work

anticipated under the Mini-MACC contract and by the TEP from lowest to highest within each

confidence rating." *Id*. at AR 2648.  The SSEB's rankings, based on Price and Past Performance, are reflected in the following chart:[12]

|   | Offeror | Factor 1: TEP | Factor 2: Past Performance |
|---|---|---|---|
| 1 | SD Construction, LLC | $933,000.00 | Substantial Confidence |
| 2 | Ancor, Inc. | | Substantial Confidence |
| 3 | AMES 1, LLC | | Substantial Confidence |
| 4 | Nodak Electric & Construction, Inc. | | Substantial Confidence |
| 5 | Orion Construction, Inc. | $1,441,274.11 | Substantial Confidence |
| 6 | Tyonek Construction Services, LLC | $1,874,000.00 | Substantial Confidence |
| 7 | Eklutna Construction & Maintenance, LLC | $1,995,080.00 | Substantial Confidence |
| 8 | Ahtna Global, LLC | | Satisfactory Confidence |
| 9 | Frawner Corporation | | Satisfactory Confidence |
| 10 | Iyabak Construction, LLC | | Satisfactory Confidence |
| 11 | White Mountain Construction, LLC | | Satisfactory Confidence |
| 12 | HPM, Inc. | | Neutral Confidence |
| 13 | Tikigaq Federal Services, LLC | | Neutral Confidence |
| 14 | ███████████ | | Late – Not evaluated |
| 15 | ██████ | | No Proposal Received |

*Id.*

      The SSEB ranked offerors receiving "Substantial Confidence" Past Performance ratings above offerors with "Satisfactory Confidence" and "Neutral Confidence" Past Performance ratings, without regard to Price.  *Id.*  Offerors within each Past Performance confidence rating category were then ranked from lowest to highest Price.  *Id.*  The SSEB determined that offerors receiving "Substantial Confidence" Past Performance ratings "were all essentially of equal value to the [G]overnment" and that "there were no single or cumulative past performance records that demonstrated that an offeror's performance history warranted an assessment of additional value amongst the other offers evaluated as '[S]ubstantial [C]onfidence.'"  Tab 41 at AR 2649.  Accordingly, the SSEB determined that for offerors receiving a "Substantial Confidence" Past Performance rating, it need not trade off Price "for a higher performance confidence rating since

---

[12] The SSEB did not provide a reason for shading cells within its chart differently.  Tab 41 at AR 2648.

the lowest priced offers with [a] [S]ubstantial [C]onfidence [rating] are recommended for award[s]." *Id.*

Rather, the SSEB conducted tradeoff analyses only for offerors receiving "Satisfactory Confidence" or "Neutral Confidence" Past Performance ratings. *See* Tab 41 at AR 2649-51. Its tradeoff analysis among those offerors was nearly identical — a lower priced bid did not outweigh a higher rated Past Performance ranking. *Id.* For example, the SSEB determined that since Frawner received a "███████████" Past Performance rating and given the Solicitation states that "Past Performance was significantly more important than [P]rice," Frawner should not receive one of the four Mini-MACC awards as its lower Price did not outweigh its ████ Past Performance rating. Tab 41 at AR 2649-50. Rather, the SSEB recommended that Frawner "be in the on-ramp pool." *Id.* at AR 2649. In sum, a bidder could not rise in ranking if it had a lower Price, but a weaker "Substantial Confidence" Past Performance rating than another offeror.

After consideration of all timely proposals, the SSEB recommended the following offerors receive the four Mini-MACC awards: (1) SD Construction, (2) Ancor, (3) Ames 1, and (4) Nodak. *Id.* at AR 2652. It further recommended the following offerors as on-ramp contractors: (1) Orion, (2) Tyonek, (3) Eklutna, (4) Ahtna, (5) Frawner, (6) Iyabak, (7) White Mountain, (8) HPM, and (9) Tikigaq. *Id.*

### B. SSA Report and Decision

In the second phase of the Air Force's evaluation, the Source Selection Authority (SSA) reviewed the SSEB's report along with "all available documents pertaining to the acquisition, including evaluation briefing slides, offeror proposals, consensus documentation, evaluation reports, price information, and other documentation." Tab 44 at AR 2704. The SSA then made its award decisions on December 20, 2021, "after extensive review of the documentation and in

consultation with the Source Selection Evaluation Board (SSEB), and . . . advisors." *Id.* at AR 2704, 2711. While it adopted many of the SSEB's findings, the SSA's conclusions differed from the SSEB report in significant respects.

i.    <u>Factor 1: Price</u>

In analyzing price reasonableness, the SSA adopted the SSEB's conclusion of reasonable prices given project costs in the Anchorage market "vary, sometimes quite significantly, between offerors on competitive proposals." Tab 41 at AR 2568. The SSA further determined that this price variance, influenced by supply and labor factors, was exacerbated by the "recent COVID-affected environment." *Id.* The SSA also based its price reasonableness determination on competition among award winners because "future [task orders] will be competed amongst all the offerors and therefore no awardee with consistently high prices will ever receive any of those competed [task orders]." *Id.*

ii.    <u>Factor 2: Past Performance</u>

In analyzing Past Performance, the SSA accepted the SSEB's Past Performance adjectival ratings and sub-ratings but differed with the SSEB's conclusion that offerors with the same overall Past Performance rating necessarily provide the Air Force with the "essentially . . . equal value." Tab 44 at AR 2710 ("I have reviewed the SSEB Report and agree with the rationales documented for the Confidence Ratings."); Tab 41 at AR 2649. Instead, the SSA determined that "there are past performance records that demonstrate that some offeror[s'] performance history warrants an assessment of additional value amongst the other offers evaluated as '[S]ubstantial [C]onfidence.'" Tab 44 at AR 2706.

iii.   <u>Tradeoff Analysis and Award Decision</u>

The SSA came to a different award determination than recommended by the SSEB.  On December 20, 2021, the SSA awarded the IDIQ contracts to (1) SD Construction, (2) Tyonek, (3) Eklutna, and (4) Orion — the "four Offerors with the highest number of Very Relevant efforts in correlation with the highest number of Exceptional [Past Performance Questionnaires] and [Contractor Performance Assessment Reporting Systems]."  *Id*. at AR 2707.  All four awardees received "Substantial Confidence" ratings.  *Id.*  As the top placed offeror, SD Construction was also awarded the seed project.  *Id.*

The SSA stated that the "remaining nine (9) offerors that submitted timely proposal[s]" would be on-ramp contractors in the following order: (1) Nodak, (2) Ancor, (3) Ames 1, (4) Frawner, (5) Ahtna, (6) White Mountain, (7) Iyabak, (8) HPM, and (9) Tikigaq.  Tab 44 at AR 2708-09.  The on-ramp offerors are listed "in order of Confidence Rating[,] [and within a Confidence Rating category based on] the number of projects found to be Exceptional and those determined to be Very Good."  *Id*. at AR 2709.

The SSA concurred with the SSEB's Price analysis using offerors' total evaluated price (TEP) for the seed project.  *Id*. at AR 2706.  However, the SSA noted that while TEPs are "useful as a guide to give the Government an indication of how each offeror would price this specific project, . . . it is not a reliable indicator of their prices for future requirements and is certainly not an indication of their prices relative to other offerors for that future work."  *Id*. at AR 2707.  Accordingly, the SSA concluded that instead of relying only on Price in comparing offerors with the same Past Performance rating, the Air Force had to consider "evidence of quality in recent and relevant projects" (*i.e.,* Quality ratings).  *Id.*

Having determined that offerors with the same Past Performance rating are not necessarily of the same value to the Government, the SSA disagreed with the SSEB's decision to forgo a best value tradeoff analysis for offerors receiving a "Substantial Confidence" rating. *Id*. at AR 2706. Accordingly, the SSA performed a best value analysis for the four awardees. *Id*. at AR 2706-08. Each is described in turn.

*SD Construction*.    SD Construction's Price was $933,000.00 with a "Substantial Confidence" Past Performance rating. *Id.* at AR 2708.  The SSA determined that SD Construction "ha[d] the offer that is most beneficial to the Government and is [thus] the first awardee listed." *Id*. at AR 2707.  Not only did SD Construction offer the lowest price at "33.6% below the mean of all TEPs," but it also had the "highest [Q]uality rating[s] of any offeror (tied with Tyonek)." *Id.*

*Tyonek & Eklutna*.    Tyonek's Price was $1,874,000.00, while Eklutna's Price was $1,995,080.00. *Id.* at AR 2708.  Both bidders received "Substantial Confidence" Past Performance ratings. *Id.*  The SSA noted that Tyonek's TEP was "33.9% above the mean of all TEPs and 100.9% higher than SD [Construction]." *Id.* at 2707.  Eklutna had "the highest TEP of any offeror and [was] 42.0% above the mean." *Id.*  Accordingly, the SSA reasoned that Tyonek and Eklutna warranted the second and third awards, respectively, for the following reasons:

> First, they have higher quality ratings than the offerors identified below as going into the on-ramp pool.  Second, any future [task orders] awarded under this Mini-MACC IDIQ will be competed amongst all awardees which will prevent any excessively high prices from being paid by the Government.  Third, although these two companies have the highest TEPs of all considered offerors their TEPs are not outside the range of reason given the high variability in construction pricing and methods in this region.  Finally, the need for well-qualified contractors able to provide quality work for the period of this Mini-MACC is worth more to the Government than the risk represented by higher TEPs for the seed project, especially when that seed project will be awarded to a different offeror.

Tab 44 at AR 2707-08.

*Orion.*  For the fourth award, the SSA recognized that two offerors it considered — Orion and Nodak — "are very closely matched" as (i) each received three "Exceptional" Quality ratings and one "Very Good" Quality rating, ███████████████████████████████████████████ ████████████████████████████████████████████."  *Id.* at AR 2708. Orion's Price was $1,441,274.11, while Nodak's Price was $████████.  *Id.* at AR 2708-09. Both bidders received "Substantial Confidence" Past Performance ratings.  *Id.* ███████████ ███████████████████, the SSA awarded the fourth contract to Orion because all four of its rated projects received "Very Relevant" sub-ratings, whereas Nodak had three projects receiving "Very Relevant" sub-ratings and one project receiving a "Relevant" sub-rating.  *Id.*  The SSA further rationalized this tradeoff by referencing the Solicitation's preference for Past Performance over Price.  *Id.*  ("Since we stated that Past Performance is significantly more important than price I conclude that Orion offers the best value to the Government, ███████████████████, based on the slightly higher quality demonstrated by the projects submitted for Past Performance when relevancy is also considered.").

***REMAINDER OF PAGE LEFT INTENTIONALLY BLANK***

The following chart summarizes the SSEB's and SSA's overall findings:

| Bidder Name | SSEB Ranking Recommendation | SSA Ultimate Ranking | Factor #1: Price[13] | Factor #2: Past Performance[14] |
|---|---|---|---|---|
| SD Construction | 1 (Recommended awardee) | 1 (Awardee and seed project awardee) | $933,000.00 | <u>Substantial Confidence</u><br>Exceptional (4)<br>Very Good (1) |
| Tyonek | 6 | 2 (Awardee) | $1,874,000.00 | <u>Substantial Confidence</u><br>Exceptional (4)<br>Very Good (1) |
| Eklutna | 7 | 3 (Awardee) | $1,995,080.00 | <u>Substantial Confidence</u><br>Exceptional (3)<br>Very Good (2) |
| Orion | 5 | 4 (Awardee) | $1,441,274.11 | <u>Substantial Confidence</u><br>Exceptional (3)<br>Very Good (1)<br>Not Assessed (1) |
| Nodak | 4 (Recommended awardee) | 5 (On-Ramp) | $ ███ | <u>Substantial Confidence</u><br>Exceptional (3)<br>Very Good (1)<br>Not Considered (1) |
| Ancor | 2 (Recommended awardee) | 6 (On-Ramp) | $ ███ | <u>Substantial Confidence</u><br>Exceptional (2)<br>Very Good (2) |
| Ames 1 | 3 (Recommended awardee) | 7 (On-Ramp) | $ ███ | <u>Substantial Confidence</u><br>Exceptional (1)<br>Very Good (2)<br>Not Received (1)<br>Not Assessed (1) |

[13] The prices referenced reflect each bidder's total evaluated price.

[14] Bidders' overall Past Performance ratings are underlined in the chart with individual Quality ratings listed below. A project received a "Not Assessed" rating if it was not assigned a Quality rating, a "Not Considered" rating if it failed to meet the Solicitation's technical requirements, and a "Not Received" rating if a bidder failed to submit all requisite information for a past project. Tab 41 at AR 2566 ("Not Assessed"); Tab 41 at AR 2594, 2612, 2629, 2634 ("Not Considered"); Tab 41 at 2581, 2640 ("Not Received").

| Frawner | 9 | 8 (On-Ramp) | $████████ | ██████████████<br>Exceptional (1)<br>Very Good (2)<br>Not Assessed (2) |
|---|---|---|---|---|
| Ahtna Global | 8 | 9 (On-Ramp) | $████████ | <u>Satisfactory Confidence</u><br>Exceptional (1)<br>Very Good (4) |
| White Mountain Construction | 11 | 10 (On-Ramp) | $████████ | <u>Satisfactory Confidence</u><br>Exceptional (1)<br>Not Assessed (3)<br>Not Considered (1) |
| Iyabak | 10 | 11 (On-Ramp) | $████████ | <u>Satisfactory Confidence</u><br>Very Good (2)<br>Not Assessed (2)<br>Not Received (1) |
| HPM Inc. | 12 | 12 (On-Ramp) | $████████ | <u>Neutral Confidence</u><br>Not Considered (3) |
| Tikigaq Federal Services | 13 | 13 (On-Ramp) | $████████ | <u>Neutral Confidence</u><br>Very Good (1)<br>Not Assessed (1)<br>Not Considered (3) |

Tab 41; Tab 44.

III.    <u>Frawner Debriefing and Current Protest</u>

On December 17, 2021, the Air Force notified Frawner that it was not selected for a Mini-MACC award.  Tab 43 (Pre-Award Notice to Unsuccessful Offeror (December 17, 2021)) at AR 2692-93.  The Air Force issued a formal Post-Award Notification to Frawner on December 28, 2021.  Tab 49 (Post-Award Notice of Unsuccessful Offeror (December 28, 2021)) at AR 2900-03.  While the Air Force informed Frawner that it was not selected for a Mini-MACC IDIQ award, the Air Force also noted that Frawner would be placed in the on-ramp reserve vendor pool.  *Id.*  Consistent with the Air Force's debriefing protocols, Frawner submitted questions to the Air Force on January 3, 2022, and the Air Force timely responded on January 5, 2022.  Tab 61 (Post-

Debriefing Questions / Response - Frawner (January [5], 2022)) at AR 4347-49.  Frawner filed the current protest in the United States Court of Federal Claims on January 26, 2022.  *See* Compl.

## APPLICABLE LEGAL STANDARD

This Court reviews post-award bid protests in two steps.  First, the Court analyzes the procurement under the Administrative Procedure Act (APA).  28 U.S.C. § 1491(b)(4); *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021).  Second, the Court must analyze whether the alleged errors prejudiced the protestor.  *See DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021).

Turning to the first step, the APA requires a reviewing court to determine "whether the agency's actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Off. Design Grp. v. United States*, 951 F.3d 1366, 1371 (Fed. Cir. 2020) (quoting *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013)); *see* 5 U.S.C. § 706.  Although the inquiry under the APA "is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416-20 (1971).  Accordingly, courts may set aside an award only if (1) "'the procurement official's decision lacked a rational basis[,]' or (2) 'the procurement procedure involved a violation of regulation or procedure.'"  *DynCorp*, 10 F.4th at 1308 (quoting *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)).

When a protestor alleges the agency's decision lacked a rational basis, the court reviews "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quotations and citations omitted).  As the United States Court of Appeals for the Federal Circuit has explained,

"the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United States,* 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quotations and citations omitted). Indeed, agency decisions are "entitled to a presumption of regularity." *Impresa Contruzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001). Protestors bear a similar burden when alleging that the procurement involved legal or procedural violations, as the court reviews such claims for "a clear . . . violation of applicable statutes or regulations." *Id.* at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

At the second step, regardless of whether the alleged error relates to irrational conduct or a violation of law, the protestor must establish that the agency's conduct prejudiced the protestor. *Sys. Studs. & Simulations, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021). This is a factual question for which the protestor must show "that there was a 'substantial chance' it would have received the contract award but for" the alleged error. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1353 (Fed. Cir. 2005) (citations omitted). *De minimis* errors in the procurement process generally do not justify relief. *Off. Design Grp.*, 951 F.3d at 1374.

If a protestor meets its burden of demonstrating that the procurement both violated the APA and prejudiced the protestor, declaratory or injunctive relief may be appropriate. *See* 28 U.S.C. § 1491(b)(2). However, successful protestors are not automatically entitled to an injunction. *See Centech,* 554 F.3d at 1037. Before entering injunctive relief, "the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Id.*

The Rules of the United States Court of Federal Claims provide the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum,* 404 F.3d at 1356. Parties initiate such proceedings by filing motions for judgment on the administrative record. *See* Rule 52.1(c). In adjudicating cross motions under Rule 52.1, this court resolves questions of fact by relying on the administrative record. *See id.* If necessary, this court may remand the case back to a governmental agency for further factual findings. *See* Rule 52.2.

DISCUSSION

While it is not this Court's role to "substitute its judgment for that of the agency," it is within this Court's purview to determine whether an agency acted irrationally, violated U.S. procurement law, or acted in conflict with the terms of the Solicitation. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416-20 (1971); *see Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351-53 (Fed. Cir. 2004) (*Banknote II*). Plaintiff argues that relief is appropriate because the Air Force allegedly (1) irrationally evaluated its Past Performance, and (2) arbitrarily evaluated Price. *See* Plaintiff's Memorandum in Support of Its MJAR (ECF No. 24-1) (Pl.'s Mem.) at 22-42.[15] Frawner seeks a permanent injunction barring the Air Force from proceeding with the Mini-MACC awards to SD Construction, Eklutna, Tyonek, and Orion. *Id.* at 42-46; Compl. at 34. While the Court holds that the award to SD Construction was lawful, it finds merit in Plaintiff's arguments relative to the three other awardees. Accordingly, for the reasons stated below, this Court enjoins the Air Force from awarding or proceeding with any award under the Solicitation other than to SD Construction. Should Defendant opt to continue with Mini-MACC awards under the Solicitation, other than to SD Construction, the Air Force shall undertake

---

[15] Citations throughout this Memorandum and Order refer to the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

corrective action consistent with this Memorandum and Order and with this Court's March 31,

2022 Order.  *See* Order Granting in Part Plaintiff's MJAR and Denying in Part Defendant's Cross-

MJAR (ECF No. 33); *see also infra* Discussion Section III(D) (detailing scope of injunction).

I.   Past Performance

    Plaintiff first argues that the Air Force's Past Performance evaluation was arbitrary and

capricious because it (1) relied on unstated evaluation criteria that failed to adhere to the

Solicitation's terms, and (2) engaged in disparate treatment by applying the evaluation criteria

differently across bidders.  *See* Pl.'s Mem. at 23-33.  Defendant responds that it (1) only relied on

evaluation criteria laid out in the Solicitation and used its broad discretion in applying those criteria

to bids, and (2) did not engage in disparate treatment.  *See* Defendant's Response to Plaintiff's

MJAR and Cross-Motion for Judgment on the Administrative Record (ECF No. 27) (Def.'s Cross-

MJAR) at 19-30.  For the reasons discussed below, this Court holds that the Air Force arbitrarily

relied on unstated evaluation criteria but did not engage in disparate treatment.  This Court further

holds that Plaintiff was prejudiced as a result of the Air Force's erroneous Past Performance

evaluation.

    A.  The Air Force Arbitrarily Relied on Unstated Evaluation Criteria

    Plaintiff contends that the Air Force's Past Performance evaluation was arbitrary and

capricious because it relied on four "unstated criteria" absent from and directly in conflict with the

Solicitation.  Pl.'s Mem. at 24-28.  Specifically, Plaintiff contends that the unstated evaluation

criteria included: (1) assigning adjectival sub-ratings to Relevance sub-factors "scope, magnitude

of effort [(magnitude)], and complexity" and then automatically designating the lowest of those

three adjectival sub-ratings as a project's overall Relevance rating;[16] (2) applying an unstated $2

---

[16] *See* Pl.'s Mem. at 24-25.

million cap for evaluating a project's "magnitude" and rating all projects over $2 million as "Not Relevant" for the "magnitude" sub-factor, thereby eliminating those projects from further consideration;[17] (3) assigning a "Very Relevant" "scope" sub-factor rating for all past projects of an offeror that demonstrated at least three of the eleven disciplines listed in the Solicitation, making no distinction amongst past projects demonstrating more than three disciplines;[18] and (4) making Quality, rather than Price, the deciding factor between bidders with the same Past Performance confidence rating in violation of the Solicitation.[19]  Defendant responds that each alleged "unstated factor" is either expressly identified in the Solicitation or is a reasonable application of the agency's broad discretion in considering Past Performance evaluations.  Def.'s Cross-MJAR at 20-25.  While the latter two of Plaintiff's contentions fail, this Court finds merit in Plaintiff's first and second arguments.  Each is addressed in turn.

i.   Undisclosed Criteria Legal Standard

In soliciting bids from contractors, "agencies must evaluate proposals and make awards based on the criteria stated in the solicitation" and "may not rely upon undisclosed evaluation criteria in evaluating proposals." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 386 (2003) (*Banknote I*) (citation omitted), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004); *see also* FAR 8.405-3(b)(1)(ii)(C) (Agencies shall ensure that an "award is made in accordance with the basis for selection in the RFQ."); FAR 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.");

_____

[17] *See id.* at 25-26.

[18] *See id.* at 26-27.

[19] *See id.* at 27-28.

*Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650 (2014) (holding agencies "must evaluate offerors' proposals based on the evaluation criteria stated in the solicitation"). This rule ensures that offerors have an equal opportunity to fairly compete for the contract. To establish that an agency's departure from the solicitation's criteria is arbitrary and capricious, a protester must show that "(i) the procuring agency used a significantly different basis in evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result — that it had a substantial chance to receive the contract award but for that error." *Banknote I*, at 386-87.

Consistent with deference afforded to the agency under the APA, deference is also afforded to an agency's past performance evaluation. *See Active Network, LLC v. United States*, 130 Fed. Cl. 421, 432 (2017), *aff'd*, 718 F. App'x 981 (Fed. Cir. 2018) ("When reviewing an evaluation of past performance in a negotiated procurement, the Court affords an agency, 'the greatest deference possible.'") (citation omitted); *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 293 (2007) (same) (citation omitted). While technical evaluations — such as assigning adjectival ratings — involve "discretionary determinations . . . that a court will not second guess," that discretion is not without its limits. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). Technical evaluations "must [still] be consistent with the factors and procedures outlined in the solicitation." *Bluewater Mgmt. Grp., LLC v. United States*, 150 Fed. Cl. 588, 614 (2020) (citation omitted); *see Banknote II*, at 1351-53. Thus, "[i]f an agency's evaluation of proposals differs significantly from the process disclosed in the solicitation, the agency's decision lacks a rational basis" and cannot sustain a protest. *See Bluewater Mgmt. Grp.*, 150 Fed. Cl. at 614 (citation omitted).

ii.  <u>Automatic Application of the Lowest of the Three Relevance Adjectival
Sub-Ratings as the Overall Relevance Rating Was Arbitrary and
Capricious as an Undisclosed Evaluation Criterion</u>

First, Plaintiff contends that the Air Force (i) arbitrarily assigned an adjectival sub-rating to the three Relevance sub-factors (scope, magnitude, and complexity) and then (ii) irrationally automatically applied the lowest of those three sub-ratings as the overall Relevance rating.  *See* Pl.'s Mem. at 24-25.  Plaintiff argues that in assessing offerors' Past Performance in this manner, the Air Force impermissibly applied unstated evaluation criteria that conflicted with the express terms of the Solicitation.  *Id.*  For example, Frawner's ███████████████████ project received an overall "Not Relevant" rating based on its "Not Relevant" "magnitude" sub-rating, despite it receiving "Very Relevant" "scope" and "complexity" sub-ratings.  Tab 41 (Source Selection Evaluation Board Report (December 8, 2021)) at AR 2642-43.

Defendant responds that since the Relevance sub-factors are stated in the Solicitation, it was within the Air Force's discretion to determine how to assess the sub-factors.  Def.'s Cross-MJAR at 21-22.  Thus, Defendant argues that the Air Force permissibly imposed a requirement that all sub-factors meet a minimum relevancy sub-rating for the project as a whole to receive further consideration.  *Id.*  While this Court agrees with Defendant that it was within the Air Force's discretion to assign adjectival sub-ratings to the Relevance sub-factors, this Court holds that the agency unlawfully imposed unstated evaluation criteria, contrary to the Solicitation, in automatically applying the lowest of three adjectival sub-ratings as the overall Relevance rating.

At the outset, this Court recognizes that the Air Force maintains significant discretion in evaluating technical performance evaluations, such as this one.  *See E.W. Bliss Co.*, 77 F.3d at 449. While the Air Force could not assign adjectival ratings that conflict with terms of the Solicitation, it had the discretion to choose its method and rationale for determining appropriate ratings.  *See*

*Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 327 (2010), *aff'd*, 440 F. App'x 926 (Fed. Cir. 2011) (holding agency acted within its discretion in "not assign[ing] an adjectival rating to each selection criterion" in determining overall adjectival rating). Thus, although the Solicitation did not require the Air Force to assign adjectival sub-ratings to the Relevance sub-factors, the Air Force was permitted to do so to streamline its evaluation process as neither the Solicitation nor any FAR provision barred such a practice. *See* Tab 8 (Solicitation No. FA500021R0001 (May 3, 2021)) at AR 379-81. Further, as noted, Plaintiff points to no jurisprudence or FAR provision that prohibits the agency from assigning adjectival sub-ratings. *See* Pl.'s Mem. at 23-25. As the "proper inquiry is not whether the FAR authorizes" a specific practice, "but whether there is any statutory or regulatory provision that precludes" the practice, this Court will not second-guess an agency's actions absent express authority prohibiting such practice. *Tyler Const. Grp. v. United States*, 570 F.3d 1329, 1333 (Fed. Cir. 2009). Accordingly, it was within the Air Force's discretion to assign each Relevance sub-factor its own adjectival sub-rating to assist the contracting officer in differentiating between the "scope," "magnitude," and "complexity" of the projects. *Cf. Weston Sols.*, 95 Fed. Cl. at 327.

However, the Air Force acted irrationally in automatically assigning the lowest of three adjectival sub-ratings as the overall Relevance rating, as that procedure amounts to a "significantly different basis in evaluating the proposals than was disclosed" and is contrary to the terms of the Solicitation. *Banknote I*, at 386-87; *see AM Gen., LLC v. United States*, 115 Fed. Cl. 653, 672-74 (2014) (holding agency committed error where its evaluation of past performance was contrary to solicitation criteria, though ultimately finding no prejudice). This Court will address the application of this criterion in three steps. First, it will describe the Solicitation's language concerning Relevance. Second, it will analyze why the automatic application of the lowest of the

three adjectival sub-ratings as the overall Relevance rating amounts to an unstated evaluation criterion.  Third, this Court will illustrate that the application of this unstated evaluation criterion cannot be squared with the Solicitation's language.

1.   Solicitation's Relevance Definitions

Relevance is one of the two components of an offeror's Past Performance rating.  Tab 8 at AR 390 (second requirement is Recency).  The Solicitation plainly stated that a past project's overall Relevance would be assessed "based upon the extent to which past performance is of similar scope, magnitude and complexity to the type of projects exemplified by the seed project for this [S]olicitation."  *Id.*  It further indicated that past projects receiving a "Not Relevant" Relevance rating would be eliminated from further consideration under the Past Performance evaluation.  *Id.* ("Those records determined to be recent, somewhat relevant, relevant, or very relevant will be assessed for quality.").  The Solicitation defined the four Relevance adjectival ratings as follows:

> Rating: Very Relevant. Definition: Present/past performance involved ***essentially the same scope and magnitude of effort and complexities*** this solicitation requires.
>
> Rating: Relevant. Definition: Present/past performance effort involved ***similar scope and magnitude of effort and complexities*** this solicitation requires.
>
> Rating: Somewhat Relevant. Definition: Present/past performance effort involved ***some of the scope and magnitude of effort and complexities*** this solicitation requires.
>
> Rating: Not Relevant. Definition: Present/past performance effort involved ***little or none of the scope and magnitude of effort and complexities*** this solicitation requires.

*Id.* (emphasis added).  The definitions were provided in decreasing degrees of relevancy with the Solicitation expressly distinguishing between those past projects with "essentially the same" ("Very Relevant"), "similar" ("Relevant"), "some of" ("Somewhat Relevant"), and "little or none" ("Not Relevant") of the applicable Relevance sub-factors.  *Id.*

2. <u>Automatic Application of the Lowest of the Three Relevance Sub-Ratings as the Overall Relevance Rating Is an Unstated Evaluation Criterion</u>

There is no dispute that the automatic application of the lowest of the three adjectival sub-ratings as the overall Relevance rating was not disclosed to bidders prior to the submission of offers.  *See* Pl.'s Mem. at 24-25; Def.'s Cross-MJAR at 21-22.  Rather, Defendant argues that because "scope," "magnitude," and "complexity" are Solicitation criteria, bidders were "on notice that these three elements are required," and that it was within the Air Force's discretion to "determine that a project is not relevant if it fails to satisfy all three stated factors."  Def.'s Cross-MJAR at 22.  While the Relevance sub-factors are listed in the Solicitation, and the Air Force has significant discretion in assigning adjectival ratings, *see supra* pp. 32-33, the agency cannot apply "a significantly different basis in evaluating the proposals than was disclosed."  *Banknote I*, at 386-87.  This Court holds that the automatic application of the lowest Relevance sub-factor as the overall Relevance rating amounts to "a significantly different basis in evaluating the proposals than was disclosed."  *Id.*

Here, bidders were not put "on notice" of the significant consequences of submitting projects containing some, but not all, of the three Relevance sub-factors — namely, that such projects would be eliminated from further consideration.  *See Lab'y Corp. of Am. Holdings*, 116 Fed. Cl. at 650-51 (holding "number of FSS test types" amounted to an unstated evaluation criterion neither stated in the RFQ nor in the Statement of Work Order where bidders were not on notice that factor would become "the predominant differentiator" in selecting awardee); *see, e.g.*, Tab 41 (Source Selection Evaluation Board Report (December 8, 2021)) at AR 2642-43.  Indeed, one would not know from the Solicitation whether a project could be eliminated for failure to satisfy one of the sub-factors nor whether all sub-ratings would be averaged together.  For example,

as described in Discussion Section I(A)(iii), this undisclosed criterion arbitrarily rendered projects valued over $2 million as "Not Relevant," even if they had relevant "scope" and "complexity" sub-ratings.  Thus, this significant criterion should have been disclosed prior to bidding so that offerors would be fully on notice of the severe consequences for past project submissions that did not contain all three sub-factors.  *Banknote I*, at 386-87.

Defendant cites *Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105 (2020), as sole support for its contention that the Air Force acted within its discretion in removing any project that did not satisfy a threshold of receiving at least a "Somewhat Relevant" rating for all three sub-ratings.  Def.'s Cross-MJAR at 22.  Defendant contends that *Tech Innovation All.*'s recognition that "determination[s] of whether a particular example of past performance is relevant involves an exercise of discretion that lies particularly within the expertise of the procuring agency" supports its claim that the Air Force had the discretion to implement a baseline for relevant projects.  Def.'s Cross-MJAR at 22; *Tech. Innovation All.*, 149 Fed. Cl. at 138.  While this Court agrees that the Air Force could set a floor for what it deems a relevant project, it did not do so properly here as that baseline cannot introduce "unstated evaluation criteria" that fails to put bidders on notice of how they would be evaluated. [20]  *Banknote I*, at 386-87; *see AM Gen.*, 115 Fed. Cl. at 672-74.  Accordingly, this Court finds the application of this unstated evaluation criterion arbitrary and capricious.

---

[20] Further, unlike in *Tech Innovation All.*, where the court's analysis focused on whether the agency rationally determined that plaintiff's past projects were not of similar "scope, magnitude of effort, and complexity," here the Court is assessing the *process* used by the Air Force for evaluating "scope, magnitude of effort, and complexity" rather than the underlying substantive findings, where the agency is afforded greater discretion.  *Compare Tech. Innovation All.*, 149 Fed. Cl. at 139, *with* Pl.'s Mem. at 24-25.

### 3.   The Unstated Criterion Conflicts with the Solicitation's Language

Not only is the automatic application of the lowest of the three Relevance sub-ratings as the overall Relevance rating an unstated evaluation criterion, it also directly conflicts with the Solicitation — establishing another basis for finding it arbitrary and capricious.  An agency's evaluation must be "consistent with the [other] factors and procedures outlined in the solicitation." *Bluewater Mgmt. Grp.*, 150 Fed. Cl. at 614 (holding unreasonable agency's failure to evaluate whether bidder's proposal satisfied solicitation's requirement that "each proposed hotel provide the required amenities").  Thus, agencies do not have discretion to directly contradict terms of a solicitation.  *Banknote I*, at 386-87; *AM Gen.*, 115 Fed. Cl. at 672-74.

The Solicitation's Relevance definitions directly contradict the Air Force's decision to automatically assign the lowest of three adjectival sub-ratings as the overall Relevance rating.  For each Relevance definition, the adjective preceding the sub-factor series (*i.e.,* "same," "similar," "some of," and "little or none") modifies each sub-factor. Tab 8 at AR 390.  This is made apparent by the use of "and" in between each of the sub-factors.  *Id.*  Thus, for example, a "Very Relevant" project must have "essentially the same" "scope" and "complexity" and "magnitude" as the seed project.  *Id.*  Based on this construction, the only projects that can be assigned an overall Relevance rating consistent with the Relevance definitions are ones that received the same sub-rating for each sub-factor (*i.e.*, assigned a "Relevant" "scope" and "complexity" and "magnitude" sub-rating).  If even one sub-factor rating is different from other two, it becomes impossible for that project to receive a Relevance rating consistent with the Solicitation's definitions.  For example, consider Frawner's ███████████████████████ project, which received a "Not Relevant" "magnitude" sub-rating and a "Very Relevant" "scope" and "complexity" sub-rating.  Tab 41 at AR 2642-43.  Under the Solicitation's Relevance definitions, the agency could not assign this

project a "Very Relevant" rating because the project does not have "essentially the same . . . magnitude," and yet it also could not assign, as it did, a "Not Relevant" rating as the project does not have "little or none of the . . . scope and complexity." Tab 8 at AR 390. Thus, in applying this reading of the Relevance definitions, only projects receiving the same sub-rating for each sub-factor could receive a Relevance rating.

However, the Solicitation requires the agency to assign all projects — including those with different sub-factor ratings — an overall Relevance rating. *Id.* at AR 390. The Solicitation states that "*each* past performance record… *will be* assessed for recency and relevance." *Id.* (emphases added). "Will" is a mandatory term. *New England Tank Indus. of New Hampshire, Inc. v. United States*, 861 F.2d 685, 694 (Fed. Cir. 1988) (explaining that terms such as "will" and "will not" are mandatory). Thus, the Solicitation mandates that each past project receive an overall Relevance adjectival rating as defined in the Solicitation, regardless of whether it received differing Relevance sub-ratings. Tab 8 at AR 390. The Solicitation's Relevance definitions fail to account for those circumstances in which a project received different sub-ratings.[21]

This Court must therefore determine whether a different reading of the Solicitation enables the agency to assign overall Relevance ratings to projects receiving differing sub-ratings. When interpreting solicitations issued by the Government, "the principles governing interpretation of Government contracts apply with equal force." *Banknote II*, at 1353 n.4. A court must "consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *AM Gen., LLC v. United States*, 115 Fed. Cl. 653, 670 (2014)

---

[21] The agency had another option for fixing the underinclusive Relevance definitions by amending the Solicitation to include Relevance definitions that account for projects receiving different sub-factor ratings. *See* FAR 15.206(c) ("Amendments issued after the established time and date for receipt of proposals shall be issued to all offerors that have not been eliminated from the competition."). The Air Force opted not to pursue this option.

(quoting *Banknote II*, at 1353).  Further, "an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result."  *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978).  As discussed above, a reading of the Solicitation that only analyzes the Relevance definitions does not allow a project that receives different sub-ratings to be given an overall Relevance rating.  This reading necessarily cannot comport with the Solicitation's requirement that all projects be assigned a Relevance rating.  Tab 8 at AR 390. Therefore, an interpretation of the Solicitation that analyzes the Relevance definitions in a vacuum necessarily leaves a part of the Solicitation "inoperative" or "meaningless" rendering such a reading unreasonable.  *Banknote I*, at 381 (holding in APA review a court is "limited to determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements").

Rather, the only reasonable construction of these definitions is that all three sub-factors must be considered together, as only that reading would permit the agency to assign each project a Relevance rating the Solicitation requires.  *Banknote I*, at 381.  Under that reading, a project such as Frawner's Repair Network Operations Center project could receive at least a "Somewhat Relevant" overall Relevance rating given it has "some of" the same Relevance sub-factors.  Tab 8 at AR 390; Tab 41 at AR 2642-43; *Banknote I*, at 381.

In sum, as the Air Force's automatic application of the lowest of three adjectival sub-ratings as the overall Relevance rating is (i) an undisclosed criterion that was not previously disclosed to bidders, and (ii) directly conflicts with the terms of the Solicitation, this evaluation scheme and its Past Performance analysis related to Relevance lacked a rational basis.  *Id.* at 386-87.  Accordingly,

the automatic application of the lowest of three adjectival sub-ratings as the overall Relevance

rating is arbitrary and capricious.

    iii.   The $2 Million "Magnitude" Cap Was Arbitrary and Capricious as an
         Undisclosed Evaluation Criterion

Second, Plaintiff argues that the Air Force arbitrarily imposed an unstated $2 million cap

by assigning a past project's "magnitude" sub-factor as "Not Relevant" if it exceeded that

undisclosed cap.  Pl.'s Mem. at 25-26.  In practice, Plaintiff contends that an undisclosed $2 million

cap for past projects, together with a Relevance rating automatically assigned based on the lowest

of three adjectival sub-ratings, rendered past projects valued at over $2 million "Not Relevant" —

removing them entirely from further consideration even if they had strong "scope" and

"complexity" ratings.  *Id.*  For Frawner, this unstated $2 million cap meant the Air Force did not

assign a Quality rating for two of its projects — ██████████████████████████████

and ████████████████████████████████ valued at $████████ and $████████, respectively.

*See* Tab 41 at AR 2643-44.

Defendant does not dispute, nor could it, that a $2 million cap for "magnitude" is absent

from the Solicitation.  Def.'s Cross-MJAR at 22-23.  Rather, it contends that the Air Force had the

discretion to choose how it evaluated "magnitude," a stated sub-factor in the Solicitation.  *Id.* at

23.  Defendant maintains that it applied that discretion reasonably in finding "a past performance

project exceeding the maximum value [for a project] under the solicitation [(i.e., $2 million)] is

not relevant on the basis of magnitude."[22]  *Id.*  Specifically with respect to Plaintiff, Defendant

---

[22] While Defendant's Cross-MJAR acknowledges that the Air Force applied a $2 million cap for evaluating projects' "magnitude" sub-ratings for Relevancy, at oral argument Defendant maintained that no $2 million "bright line rule" existed.  *Compare* Def.'s Cross-MJAR at 18 ("It thus falls within the Air Force's discretion that a past performance project exceeding the maximum value under the solicitation [(i.e., $2 million)] is not relevant on the basis of magnitude."), *with*

argues that it was within the Air Force's discretion to find two of Frawner's past projects valued at over $2 million "Not Relevant" for "magnitude" because (1) a majority of projects under the Solicitation were expected to be valued at less than $500,000,[23] (2) the seed project had an estimated value between $500,000 and $1 million,[24] and (3) the maximum task order under the Solicitation was $2 million.[25]   Def.'s Cross-MJAR at 22-23.   This Court is unpersuaded by

---

Tr. Oral Arg. at 45:19 (stating on behalf of Defendant that "[t]here's no $2 million cap"), 51:18-23 ("THE COURT: So it's not a hard cap? The 2 million is not a hard cap.   [DEFENDANT'S COUNSEL]: It's not a rule that anyone said.   This is what the past performance evaluation team decided on how to implement, how to, you know, apply this factor or this subfactor.").   Rather, Defendant argued that an analysis was undertaken by the agency to determine if the project's price was close enough to the Solicitation's $2 million maximum task order value.   Tr. Oral Arg. at 45:19.

After review of the Administrative Record, the Court is skeptical of Defendant's shift in position and argument that the Air Force did not impose a $2 million cap in analyzing the "magnitude" sub-factor.   For example, at a first glance, Orion's ███████████ ████████ project exceeded the cap as its final contract value was $██████ over $2 million.   Tab 36 at AR 2256 (noting on PPQ, project's final "[a]ward [a]mount" of $██████████).   However, the SSEB viewed the project's initial value as under $2 million and proceeded to assign the project a Quality rating — supporting the likelihood of a $2 million cap.   *See* Tab 41 at AR 2617-18.   Further, the SSEB's rationale for eliminating two of Frawner's projects expressly invoked a $2 million cap.   Tab 41 at AR 2647 (assigning two of Frawner's projects "Not Relevant" ratings because "each exceeded the maximum value of the task order under the Mini MACC, and the solicitation stated the maximum value of a task order under the Mini MACC is $2M").

However, even if Defendant was not applying a $2 million cap and was instead analyzing whether a project over $2 million in value was nonetheless close enough to $2 million to be considered relevant, that procedure would still amount to an unstated evaluation criterion as the agency would be implementing a binary pass/fail test with projects valued under or close to $2 million receiving "Very Relevant" "magnitude" sub-rating and those projects valued at some amount just over $2 million receiving "Not Relevant" "magnitude" sub-rating.   For the reasons further described below, such a ratings procedure is arbitrary and capricious for the same reasons the $2 million cap itself is arbitrary and capricious — it is an unstated criterion that needed to be disclosed to offerors.

[23] Tab 8 at AR 395.

[24] Tab 9 (Amendment 0001 (May 3, 2021)) at AR 694.

[25] Tab 8 at AR 323.

Defendant's arguments and holds that the agency's undisclosed $2 million cap on past project submissions and its impact on the entire ratings procedure is arbitrary and capricious.

While the Air Force is entitled to a significant deference in evaluating "magnitude," a stated Solicitation sub-factor, the agency's "technical evaluations must [still] be consistent with the factors and procedures outlined in the [S]olicitation." *Lab'y Corp. of Am. Holdings*, 116 Fed. Cl. at 650. Thus, "[i]f an agency's evaluation of proposals differs significantly from the process disclosed in the solicitation" or fails to put offerors "on notice" of how they will be evaluated, the agency's decision lacks a rational basis. *Id.*; *see Banknote I*, at 382 (citation omitted).

The Air Force failed to put bidders "on notice" of the serious consequences of failing to meet an unstated $2 million cap requirement, which would render an entire past project's submission as "Not Relevant" for purposes of the Past Performance analysis. *See, e.g.*, Tab 41 at AR 2642-45. Namely, projects valued at over $2 million would receive a "Not Relevant" "magnitude" sub-rating and this, together with the automatic assignment of the lowest of the three adjectival Relevance sub-ratings as the overall Relevance rating, would render the entire past project submission as "Not Relevant." *Id.* Due to their overall "Not Relevant" rating, these projects were then entirely removed from further consideration for purposes of a Past Performance evaluation. *See id.* (removing from further consideration two of Frawner's projects valued at over $2 million "[d]ue to past performance determination of Not Relevant"); *see also* Tab 8 at AR 390 (no Quality rating assigned to projects deemed "Not Relevant").

While the $2 million maximum task order under the Solicitation may have put bidders "on notice" that past projects valued at over $2 million might be rated as less relevant than those valued under $2 million, the Solicitation did not put bidders "on notice" that such past projects exceeding $2 million would be entirely eliminated from further consideration. Presumably, if Plaintiff had

known about a $2 million cap, it would not have submitted two projects valued at over $2 million, especially given the Solicitation's five past project submission limit.  *See id.* at AR 2642-44. Frawner would have had the knowledge and choice to have submitted different projects that met the agency's desired requirements, including this unstated criterion.  *See id.*

The arbitrariness of the $2 million cap is further highlighted in two respects.  <u>First</u>, the Air Force failed to differentiate the "magnitude" sub-ratings it assigned projects valued under $2 million.  All past projects bidders submitted for consideration valued under $2 million received "Very Relevant" "magnitude" sub-ratings.  *See, e.g.*, *id.* at AR 2570-71, 2617-18.  For example, SD Construction's ██████████████████████████ project, valued at $████, received the same "Very Relevant" "magnitude" sub-rating, *id*. at AR 2570-71, as Orion Construction's ████████████████████████ project valued about 136 times as much at $████████.  *Id*. at AR 2617-18.  The large gap in value between these projects, despite both receiving the same "magnitude" sub-rating, reflects the Air Force's application of a binary pass/fail approach in which projects valued below $2 million received "Very Relevant" "magnitude" sub-ratings, while a project valued even a little bit above $2 million received a "Not Relevant" "magnitude" sub-rating.  Since a project's consideration hinged entirely on whether it was valued above or below $2 million, the Air Force was required to disclose this "unstated evaluation criteri[on]" to offerors prior to bid submission.  *Banknote I*, at 386-87.

<u>Second</u>, the Air Force failed to give weight to whether a project was in the seed project's range of the $500,000 to $1 million, despite the Solicitation's indication otherwise.  *See* Tab 9 at AR 694.  While the Solicitation made clear that a majority of projects awarded under the Mini-MACC were expected to be valued at less than $500,000, Tab 8 at AR 395, the Solicitation also indicated that Relevance would be assessed "based upon the extent to which past performance is

of similar scope, magnitude and complexity to the type of projects *exemplified by the seed project* for this [S]olicitation." *Id.* at AR at 390 (emphasis added). Given the Solicitation's use of the seed project as a basis for comparing the Relevance of past performance, it was irrational for the Air Force to completely ignore the seed project price in differentiating between past projects valued within the seed project range and those valued below it. Yet, the agency did just that when it equally rated a project within the seed range as ones outside it. *Compare* Tab 41 at AR 2646 (assigning Frawner's project valued at $█████ with "magnitude" sub-rating of "Very Relevant"), *with id.* at AR 2586 (assigning Eklutna's project valued at $█████ with "magnitude" sub-rating of "Very Relevant"). As a project's "magnitude" evaluation was based solely on whether its value exceeded $2 million and projects were eliminated from further consideration if they exceeded the cap, it was arbitrary and capricious for the agency not to disclose this evaluation criterion to offerors in the Solicitation prior to accepting bids. *Banknote I*, at 386-87.

> iv.   The Air Force Rationally Assigned "Very Relevant" "Scope" Sub-Ratings for Projects with at Least Three Disciplines

Third, Plaintiff argues that the Air Force's "scope" analysis was unreasonable because it assigned a "Very Relevant" "scope" sub-rating to any past project demonstrating at least three of the eleven disciplines listed in the Solicitation. Pl.'s Mem. at 26-27. Plaintiff contends that the agency set the bar "so low" as to be at odds with the Solicitation's "express preference for multi-discipline experience across submitted projects" resulting in most projects receiving a "Very Relevant" "scope" sub-rating, with no distinctions made between projects with three to eleven disciplines. *Id.* Defendant responds that the Air Force acted within its broad discretion in using three disciplines to discriminate between "scope" sub-ratings. Def.'s Cross-MJAR at 21-22. This Court agrees with Defendant.

While Plaintiff correctly notes that the Solicitation requires successful bidders to have experience in multi-disciplines, the Solicitation is silent on what constitutes "multi-disciplinary" experience.  Tab 8 at AR 380 ("Relevant past performance information for the five (5) completed projects must demonstrate minimum design/build and build experience with multiple disciplines (as stated above).").  The Solicitation's silence grants the agency discretion to consider what amounts to "multi-disciplinary" experience as long as it does so rationally.  *Banknote II*, *at* 1355-56 (holding an agency rationally "weigh[ed] technical and price factors equally" where, *inter alia*, the solicitation was silent on the interplay between the factors).  As explained below, the Air Force's "scope" analysis was rational.

It is not this Court's role to decide whether three disciplines rather than four, five, six, or seven should serve as the discriminator between projects receiving a "scope" sub-rating of "Very Relevant" versus "Relevant."  This determination – one based on expertise and judgment – is exactly the type of technical decision this Court is required by law to leave to the discretion of the agency.  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (holding court will not "second guess" agency's "technical ratings" which "deal with the minutiae of the procurement process").  Further, in negotiated procurements such as this one, "[p]rocurement officials . . . enjoy a greater degree of discretion in determining which proposal is most beneficial to the Government."  *E.W. Bliss Co. v. United States*, 33 Fed. Cl. 123, 141 (1995), *aff'd,* 77 F.3d 445 (Fed. Cir. 1996).  This Court will not "second guess" the Air Force's judgment here, based on its experience, that the presence of three disciplines satisfies its need for multi-discipline experience.  *E.W. Bliss Co.*, 77 F.3d at 449.

Unlike the evaluation of "magnitude," where bidders were not put "on notice" that their submissions must be valued under $2 million to be considered, *see supra* Discussion Section

I(A)(iii), for "scope" evaluations, bidders were clearly "on notice" of the need to submit past projects that demonstrated some or all of the eleven disciplines listed in the Solicitation.  Tab 8 at AR 380; *Banknote I*, at 382-87 ("[I]t is well-settled that a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.") (citation and internal quotations omitted).  Indeed, this notice is unlike the "magnitude" context.  There, for example, the Air Force failed to distinguish among projects valued at less than $2 million, creating an undisclosed, binary pass/fail test, *see supra* Discussion Section I(A)(iii).  Here, the "scope" analysis did not involve a binary pass/fail test; projects were still given adjectival ratings and allowed to continue in the evaluation process.  Further, in its evaluation of "scope," the Air Force differentiated between projects with two versus three disciplines by rating projects with two disciplines "Relevant" and three disciplines "Very Relevant," reflecting application of a spectrum of possible Relevancy "scope" ratings.  *See, e.g.*, Tab 41 at AR 2593 (awarding ███████ a "Relevant" "scope" sub-rating for project containing two of the disciplines); Tab 41 at AR 2646 (awarding █████████ a "Relevant" "scope" sub-rating for project containing two of the disciplines).  Finally, Plaintiff cannot point to a law violated by the Air Force's use of discretion in this manner and the Court can find none.  Accordingly, this Court holds that the Air Force acted reasonably in conducting its "scope" sub-factor analysis.

> v.  <u>The Air Force Rationally Looked Beyond the Past Performance Adjectival Ratings in Analyzing Quality Ratings Before Comparing Past Performance to Price</u>

Finally, Plaintiff argues that the Air Force abused its discretion in making Quality, rather than Price, the deciding factor between bidders with the same Past Performance confidence rating, purportedly in contravention of the Solicitation's requirements.  Pl.'s Mem at 27-28.  Plaintiff notes that while the SSEB analyzed competing bids in accordance with the Solicitation by making

Price the determining factor, the SSA wrongfully declined to adopt that analysis.  *Id.*  Defendant responds that it was within the SSA's "discretion to consider the quality of the past performance projects" given Quality is a sub-factor of the overall Past Performance assessment.  Def.'s Cross-MJAR at 24.  Again, this Court agrees with Defendant.

The Solicitation indicates that if the Government awards the contract to a bidder other than one with the lowest price, "the Source Selection Authority will make an integrated assessment best value award decision using the *price and the Past Performance Confidence Rating*."  Tab 8 at AR 389 (emphasis added).  Here, the Air Force awarded three of the four contracts to bidders that did not bid the lowest price; therefore, the Air Force was required to conduct a best value tradeoff.[26] *Id.; see also* Tab 41 at AR 2566 (second place contract awardee Tyonek Construction price of $1,874,000.00) (third place contract awardee Eklutna Construction price of $1,995,080.00) (fourth place contract awardee Orion Construction price of $1,441,274.11); Tab 8 at AR 391 (requiring best value tradeoff analysis if agency awarded to bidders other than lowest priced).

Plaintiff rightly acknowledges that the agency could consider Quality, as Quality is expressly identified in the Solicitation's Past Performance evaluation criteria.  Pl.'s Mem. at 27-28.  Plaintiff's argument instead centers on *when* the Air Force could consider Quality.  *Id.* ("[O]nce the Agency determined that offerors were assigned the same adjectival Past Performance confidence rating, it should have considered Price as the discriminator."); Tab 8 at AR 390 ("Those records determined to be recent, somewhat relevant, relevant, or very relevant will be assessed for quality.").  Plaintiff contends that the Air Force *first* had to evaluate Quality for each relevant

---

[26] In fact, the Air Force awarded two of the four contracts to the highest priced bidders.  *See* Tab 41 at AR 2566 (second place contract awardee Tyonek Construction price of $1,874,000.00) (third place contract awardee Eklunta Construction price of $1,995,080.00).  The sufficiency of the Air Force's best value tradeoff analysis is discussed below.  *See infra* Discussions Section II (B) and (C).

project, *second* assess an overall Past Performance confidence rating, and *third* use only Price as the differentiator between bidders with the same Past Performance ratings.  Pl.'s Mem at 27-28; Plaintiff's Reply in Support of Its MJAR (ECF No. 28) (Pl.'s Reply) at 10.  This Court disagrees.

While the Solicitation clearly indicated that a Quality analysis would occur before Price enters the equation, Plaintiff's argument fails to account for an agency's duty to look beyond adjectival ratings in making value judgments.  *See* Tab 8 at AR 389-90; *see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 909 (Fed. Cir. 2013) (finding rational an agency's decision to consider sub-factor ratings and narrative comments, rather than just considering overall ratings); *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 758 (2008) ("Looking beyond the adjectival ratings is necessary because proposals with the same adjectival rating are not necessarily of equal quality.") (internal quotations and citation omitted).  The agency's ability to look beyond the overall Past Performance adjectival ratings ensures that the agency can "determine which proposal represents the best value for the government."  *E.W. Bliss Co.*, 77 F.3d at 449.  As the agency was allowed to look beyond overall Past Performance in its best value analysis, and because Quality could be an important factor on its own, the Air Force was permitted to use Quality ratings when comparing offerors with identical Past Performance ratings.  *See* Tab 8 at AR 389-90. Plaintiff presents no authority that bars the Air Force from looking past the Past Performance adjectival rating, and, as discussed, relevant authority dictates that the agency *should* look past those ratings.  *See* Pl.'s Mem. at 27-28.  Accordingly, the Air Force acted rationally in looking beneath the veil of the overall Past Performance ratings to Quality sub-ratings before making a comparison with Price.[27]

---

[27] The sufficiency of the Air Force's Price analysis is discussed *infra* at Discussion Section II (A) and (B).

B.  <u>The Air Force Did Not Engage in Disparate Treatment</u>

Plaintiff next contends that the Air Force engaged in inappropriate disparate treatment concerning its Past Performance evaluation by unreasonably evaluating its past project submissions differently than other bidders' submissions.  Pl.'s Mem. at 28-31.  Specifically, Plaintiff points to five instances of alleged disparate treatment: (1) assigning two of Frawner's projects "Very Good" ratings while assigning "Exceptional" ratings to a project from Orion and a project from SD Construction with "identical" Past Performance Questionnaire (PPQ) responses,[28] (2) rating one of Orion's projects as "Recent" despite its alleged completion after the Solicitation's issuance,[29] (3) relaxing the $2 million "magnitude" cap by rating one of Orion's projects whose *final* contract value exceeded $2 million as "Very Relevant,"[30] (4) accepting a project submission from Tyonek despite Tyonek's failure to use a required PPQ form,[31] and (5) crediting one of Tyonek's projects with demonstrating a "Demolition" discipline despite that the discipline was not listed on its PPQ, while failing to credit one of Frawner's projects with demonstrating a "Minimal Design" discipline, which was indicated on its PPQ.[32]  None of these occurrences reach the threshold Plaintiff must meet to establish disparate treatment.

To prevail in a disparate impact claim, a protestor must establish either (i) "that the agency unreasonably downgraded its proposal for deficiencies that were '*substantively indistinguishable*' or nearly identical from those contained in other proposals," or (ii) "that the agency inconsistently

---

[28] *See* Pl.'s Mem. at 28-29.

[29] *See id.* at 29.

[30] *See id.* at 29-30.

[31] *See id.* at 30.

[32] *See id.* at 30-31.

applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (emphasis added) (citation omitted).  FAR 1.102-2(c)(3) highlights the demanding standard for establishing disparate treatment by stating that while "[a]ll contractors and prospective contractors shall be treated fairly and impartially[,] [they] need not be treated the same."   Thus, as recognized by *Office Design Group*'s "substantively indistinguishable" standard, a plaintiff must establish more than just varying treatment to meet its burden of showing disparate treatment. *Office Design Grp.*, 951 F.3d at 1372.  Plaintiff fails to do so here.

First, Plaintiff argues that two of Frawner's projects (███████████████████ ██████) should have received the same "Exceptional" Quality ratings as Orion's █████████ █████████████████████████████ project and SD Construction's █████████ project due to their allegedly "identical" favorable ratings on their respective PPQs.  Pl.'s Mem. at 28-29. Instead, both of Frawner's past projects received "Very Good" Quality ratings, while Orion's and SD Construction's past projects received "Exceptional" Quality ratings.  *See* Tab 41 at AR 2574 (SD Construction's project rating), 2619 (Orion's project rating), 2647 (Frawner's projects' ratings).  Plaintiff's claim is factually flawed.   Both of Frawner's projects received the most favorable ratings for twelve out of fifteen PPQ questions, whereas SD Construction's project received the most favorable ratings for fourteen out of fifteen PPQ questions.  *See* Tab 32 (Frawner Past Performance) at AR 1926-30 (Frawner's Camp Carrol project PPQ), 1950-54 (Frawner's Steam Heating System project PPQ); Tab 37 ([SD Construction's] Past Performance Questionnaires) at AR 2327-31 (SD Construction's FSS Warehouse project PPQ).  While Orion's project — like Frawner's — also received the most favorable ratings for twelve out of fifteen PPQ

questions, the Air Force rationally could have credited it with thirteen favorable ratings instead because the reference mistakenly assigned Orion the lowest score in response to a question that did not apply to Orion.  *See* Tab 36 (Orion Past Performance) at AR 2253 (noting in the comments section of the PPQ that "THERE WERE NO CHANGE PROPOSALS" in response to question: "Did the contractor submit reasonably priced change proposals?").  As Frawner does not have a similar project that was mistakenly rated lower than it should have been due to the inclusion on an inapplicable question, Plaintiff cannot establish that the Air Force treated "substantively indistinguishable" projects differently.  *Office Design Grp.*, 951 F.3d at 1372.  Accordingly, this claim fails to establish disparate treatment.  *Id.*

Second, Plaintiff argues that the Air Force erroneously rated as "Recent" Orion's ████ ████████████████████████ project despite the project's expected completion date of June 15, 2021, which was past the Solicitation's time limit for Recent past projects.  Pl.'s Mem. at 29 (citing Tab 41 at AR 2615).  Specifically, Plaintiff contends that the project could not be rated as Recent because the Solicitation defined Recent as "those efforts completed for any customer(s) within the last three (3) years prior to the issuance date of the [S]olicitation," which Plaintiff maintains is April 30, 2021.  *Id.*; Tab 8 at AR 390.  Plaintiff, again, bases its claim on factually inaccurate information — this time likely due to a clerical error by the SSEB.  The SSEB noted that Recent projects are ones "completed within three (3) years of the [S]olicitation date of April 30, 2021."[33]  *See, e.g.*, Tab 41 at AR 2614.  However, the Solicitation was issued on May 3, 2021, not on April 30, 2021.  Tab 9 at AR 621 (noting "DATE ISSUED 5/3/2021").  While one of

---

[33] During oral argument, counsel for Defendant acknowledged the SSEB's likely typographical error in its report and verified that May 3, 2021 is the Solicitation's issuance date.  Oral Arg. Tr. at 55:9-14 ("I verified with the contracting officer, the effective date is May 3rd . . . I don't know if it's a typo in the board's report or, you know, they were just using --I mean, it's just a few days off.").

Orion's references indicated in a PPQ that the ▮▮▮▮ project was only expected to be completed by June 15, 2021 (after the Solicitation issuance date), the Air Force rationally determined that the project would be "completed" by May 3, 2021, as Orion listed the project's period of performance as lasting from July 2019 to May 2021 on its Past Performance Information Document.  Tab 23 (Transmittal Email – Orion Construction, Inc. (June 14, 2021)) at AR 1304 (Orion's Past Performance Quality Satisfaction Ratings of Contract); Tab 36 at AR 2239 (Orion's PPQ for ▮▮▮▮ project).  Accordingly, Orion's past project fell within the range of Recent past projects eligible for consideration under the Past Performance factors.  Thus, Plaintiff has failed to establish that the Air Force "inconsistently applied objective solicitation requirements" in this instance.  *Office Design Grp.*, 951 F.3d at 1372.

  <u>Third</u>, Plaintiff argues that the Air Force impermissibly relaxed its $2 million "magnitude" cap for one of Orion's projects.  Pl.'s Mem. at 29-30.  Plaintiff's contention is insufficient to establish disparate treatment.  As previously noted, Orion's Alaska Regional Fire Training Center Building Rehabilitation project was initially valued at $▮▮▮▮▮▮, with a final contract value of $▮▮▮▮▮.  Tab 36 at AR 2256.  The Air Force awarded the project a "Very Relevant" magnitude sub-rating.  Tab 41 at AR 2618.  While the imposition of a $2 million cap itself is arbitrary and capricious, *see supra* Discussion Section I(A)(iii), Plaintiff fails to establish that there was another "substantively indistinguishable" project, as is required for establishing disparate treatment, that, like the Alaska Regional project, was initially valued at less than $2 million *and* was not rated as "Very Relevant" for "magnitude."  *Office Design Grp.*, 951 F.3d at 1372; *see also supra* n.22; Tr. Oral Arg. at 49:15-50:9.  Further, even if the agency used Orion's ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ project's final contract value in assigning its "magnitude" sub-rating, Plaintiff still cannot establish disparate treatment.  Unlike Orion's project,

whose final value was less than $███████ above the cap, the next closest project over $2 million among all bidders was over fifty-times that amount ($████████ over $2 million) and Frawner's closest project over $2 million was over one-hundred times that amount ($████████ over $2 million).  Tab 41 at AR 2632; Tab 41 at AR 2644.  Accordingly, the Air Force did not engage in disparate treatment by rating a project with an initial value of under $2 million, that later rose to $███████ over $2 million in its final value, as "Very Relevant" for "magnitude." *Office Design Grp.*, 951 F.3d at 1372.

Fourth, Plaintiff argues that the Air Force engaged in disparate treatment by accepting a different PPQ form than provided by the Solicitation for Tyonek's ████████████ ████████ project.  Pl.'s Mem. at 30.  Plaintiff contends that the Air Force was required to reject Tyonek's PPQ for that past project.  *Id.*  Additionally, Plaintiff asserts that the Air Force could not assess that past project for Quality since the Solicitation indicated that "[o]nly required documents will be accepted."  *Id.* (quoting Tab 8 at AR 383).  These arguments are unavailing.  As Plaintiff acknowledges, the PPQ submitted on behalf of Tyonek is "similar to the RFP Attachment J-7," which is the PPQ for use in this procurement.  *Id.*  In fact, it is nearly identical except for a list of applicable disciplines.  *Compare* Tab 39 (Tyonek Past Performance Questionnaires) at AR 2390-95 (containing same elements as J-7 form except for a list of disciplines), *with* Tab 8 at AR 613-18 (Attachment J-7).  Since the documents were nearly identical and Plaintiff does not contest that the Air Force had other ways to assess the project's relevant disciplines including the Past Performance Supplement Worksheet provided by Tyonek, this Court finds it was rational for the agency to determine that Tyonek's PPQ met its "required document" condition.  *See* Pl.'s Mem. at 30; *see also* Pl.'s Reply at 13-14.  Thus, the Air Force permissibly assigned the project a Quality rating.  Tab 41 at AR 4196-97.  Further, Plaintiff fails to demonstrate that the Air Force

"inconsistently applied objective solicitation requirements" in accepting a form that was nearly identical to the one requested as it cannot point to an Air Force rejection of any similar form. *Cf. Office Design Grp.*, 951 F.3d at 1372-73 (holding agency disparately treated plaintiff by assigning points to awardee and not to plaintiff where *both* failed to "provide a (1) description of the process of inventory, cataloging and protecting [agency] property and (2) description of materials used and how they are applied to protect [agency] property during installation," but finding no prejudice). Accordingly, Plaintiff's disparate treatment argument similarly fails on this ground as well.

    Fifth, Plaintiff argues that the Air Force impermissibly credited Tyonek's ███████ ████████████ project with having a "Demolition" discipline even though Tyonek's reference did not check it off on the PPQ, but failed to appropriately credit Frawner's ███████ project with a "Minimal Design" discipline indicated on its PPQ. Pl.'s Mem. at 30-31. Plaintiff contends that the failure to credit Frawner's APU System project resulted in an assignment of a "mere Relevant rating." *Id.* at 31. Plaintiff's argument fails to demonstrate that the Air Force engaged in disparate treatment. As described below, the Air Force considered the totality of documentation that Tyonek and Frawner provided before determining whether each respectively satisfied applicable disciplines. While the reference for Tyonek's ██████████████████ project PPQ did not indicate the presence of the "Demolition" discipline, in its Past Performance Information Document, Tyonek noted that the project included "[r]emov[ing] [an] existing muriatic acid system." Tab 26 (Tyonek Contractor Services, Inc. (June 14, 2021)) at AR 1482; Tab 39 at AR 2367 (PPQ for Tyonek's ████████████████). As the Solicitation is silent on how projects must meet the Air Force's "multi-discipline" needs, nothing barred the Air Force from crediting a project's inclusion of disciplines based on the totality of substantive documentation a bidder provided rather than merely whether a reference checked off the discipline

box on the PPQ form.  Tab 8 at AR 397; *Banknote II*, at 1356 (holding when solicitation is silent, agency need only act rationally).  Thus, the SSEB had a rational basis to determine that Tyonek's project included a "Demolition" discipline where the reference did not identify the discipline on its PPQ form but was evident in the contractor's description of the scope of the project performed.  Accordingly, the "Demolition" discipline was permissibly credited.  Tab 41 at AR 2605.

The Air Force also appropriately treated Frawner's projects similarly.  Just as for Tyonek, the Air Force did not cabin its discipline determination to consideration of whether a box was checked off on the PPQ concerning Frawner's ▮▮▮▮▮▮ project.  However, unlike Tyonek, Frawner's other documentation of its past project justified the Air Force's decision to forgo crediting Frawner's ▮▮▮▮▮ project with a "Minimal Design" discipline.  While Frawner's reference for the ▮▮▮▮▮ project checked off the box indicating the project's inclusion of the "Minimal Design" discipline, Tab 32 at AR 1938, Frawner did not note the "Minimal Design" discipline for this project in its own Past Performance Supplement Worksheet, indicating Frawner itself did not submit this past project satisfied the "Minimal Design" discipline.  *See* Tab 19 (Transmittal Email - Frawner Corporation (June 14, 2021)) at AR 1127.  Unlike the other disciplines, "Minimal Design" is expressly defined in the Solicitation, with an entire paragraph explaining the "necessary documentation to indicate that adequate engineering and planning to accomplish the requirement has been accomplished."  Tab 8 at AR 380 ("Minimal Design as specified in Mini-MACC SOW 01000, para. 1.3"), AR 395-96.  It was reasonable for the Air Force to have believed that Frawner reviewed those Solicitation requirements when it opted to forgo selecting the "Minimal Design" discipline for the ▮▮▮▮▮ project in its Past Performance Supplement Worksheet.  *Banknote I*, at 381 (applying reasonableness standard in APA review). The Air Force cannot make the same inference for the third-party reference who completed

Frawner's PPQ.  Accordingly, the Air Force had a rational basis to forgo crediting the ██████

project with the "Minimal Design" discipline.  As the Air Force treated both Frawner and Tyonek

under the same standards, Plaintiff fails to establish disparate treatment with this claim as well.

*Office Design Grp.*, 951 F.3d at 1372.

As all of Plaintiff's allegations of disparate treatment fail to meet the *Office Design Group*

"substantively indistinguishable" or "inconsistent[] appli[cation] [of] objective solicitation

requirements" standard, Plaintiff cannot establish that the Air Force engaged in disparate treatment

in its Past Performance evaluation.  *Id.*

C.   Plaintiff Is Prejudiced by the Air Force's Improper Past Performance Evaluation

Having found that the Air Force arbitrarily applied unstated evaluation criteria, *see infra* at

Discussion Sections I(A)(ii)-(iii), this Court must assess whether Plaintiff has demonstrated

prejudice necessary to succeed in its past performance claim.   *Impresa Contruzioni Geom.

Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (requiring showing of

prejudice to succeed on claim).  To establish prejudice, "a protestor must show that but for that

error, the protestor had a substantial chance of receiving a contract award," or put another way —

barring the error the protestor would have been "within the zone of active consideration." *Off.

Design Grp.*, 951 F.3d at 1373-74; *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326

(Fed. Cir. 2011) (citing *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)).  For

the reasons explained below, Plaintiff has demonstrated that it would have had a "substantial

chance" of receiving one the Air Force's four awards "but for" the two errors in the Air Force's

past performance evaluation — namely its arbitrary (i) automatic assignment of the lowest of the

three Relevance sub-factor ratings as the overall Relevance rating, and (ii) imposition of an

unstated $2 million cap when evaluating "magnitude."   *See infra* Discussion Sections I(A)(ii)-(iii).

The Federal Circuit has not yet issued clear guidance concerning what would constitute a "substantial chance" of receiving the award.  Within those constraints, this Court finds the SSA's review helpful to its analysis.  The SSA reviewed the top seven bidders with a "Substantial Confidence" Past Performance rating to determine which four of those seven would receive the awards.  Tab 44 at AR 2706 ("I determined the best value for the government is to consider offerors with a performance confidence assessment of Substantial Confidence before other offerors."). Plaintiff received a "███████████████" past performance rating, and thus was not in the running for an award.  Tab 41 at AR 2647.  When asked at oral argument whether bidders that received a "Substantial Confidence" past performance rating were in the "zone of active consideration" for one of the awards, counsel for Defendant responded in the affirmative.  Tr. Oral Arg. at 56:21-25 ("THE COURT: Let me ask you about prejudice.  Do you think it's fair to say that all bidders that . . . received a substantial confidence rating were in the zone of active consideration for the award?  [DEFENDANT'S COUNSEL]: Yes, Your Honor.").  This Court agrees that Plaintiff meets its burden of establishing prejudice if it can demonstrate that it would have received a "Substantial Confidence" rating if not for the Air Force's errors.  Plaintiff has done so here.

The SSEB assigned "Substantial Confidence" ratings to those offerors "found to have performed work comparable to the scope, magnitude, and complexity associated with Mini-MACC task orders, and based upon evaluation of PPQs and CPARs, obtained Very Good to Exceptional [Quality] ratings."  Tab 41 at AR 2649.  The SSA adopted the SSEB's adjectival ratings.  Tab 44 at AR 2710 (SSA noting that it "reviewed the SSEB Report and agree[d] with the rationales

documented for the Confidence Ratings.").  While one of Plaintiff's past projects received an "Exceptional" Quality rating and two others received "Very Good" Quality ratings, two of Plaintiff's past projects were not rated and did not receive any Quality rating because their "magnitude" was valued at over $2 million.  Tab 41 at AR 2642-46 (██████████████████████ ████████████████████████████████████████).  Had the Air Force not eliminated these two projects from consideration based off its unstated $2 million "magnitude" cap and its unstated lowest of three sub-factor rule, these projects would have been assigned an overall "Relevance" rating, and thus would have received a Quality rating.  Tab 8 at AR 390. Indeed, these projects likely would have received at least "Very Good" Quality ratings since no project rated for Quality by the SSEB received a rating lower than "Very Good," and there is no reason that these projects would be rated differently.  *See* Tab 41; *see also supra* pp. 24-25 (referencing chart).

Additionally, both of Frawner's non-assessed projects are "comparable to the scope, magnitude, and complexity associated with Mini-MACC task orders."  Tab 41 at AR 2649.  First, both projects received "Very Relevant" "scope" and "complexity" sub-factor ratings, the highest possible sub-ratings.  Tab 41 at AR 2642-45.  While both projects received overall "Not Relevant" ratings due to the Air Force's arbitrary application of an unstated $2 million cap, both projects could have received strong Relevance ratings, especially considering projects right under the $2 million threshold received the highest possible "magnitude" sub-rating.  *See, e.g.*, Tab 41 at AR 2618 (assigning Orion's ██████████████████████████ project valued at $██████████ a "Very Relevant" "magnitude" sub-rating).  Indeed, one of Frawner's non-assessed past projects was valued at only $██████████ above $2 million.  *Id.* at AR 2644 (valuing ██████████████████████████████ at $██████████).  Frawner's non-assessed

projects received the highest "Very Relevant" Relevance sub-factor ratings for "scope" and "complexity" and may likely have received, at minimum, "Very Good" Quality ratings. *See id.* at AR 2642-45. Accordingly, Frawner would likely have received a "Substantial Confidence" Past Performance rating if not for the Air Force's errors.[34] This Past Performance rating would have placed Plaintiff in the "zone of active consideration," as Defendant properly acknowledged at oral argument. *Allied Tech. Grp., Inc.*, 649 F.3d at 1326 (citation omitted); *see also* Tr. Oral Arg. at 56:21-25.

Lastly, Plaintiff was prejudiced by the Air Force's arbitrary application of unstated evaluation criteria because it was not able to tailor the submissions of its projects to match such unstated criteria of which it had no notice. Had Plaintiff known of a $2 million cap and the undisclosed consequences of exceeding that cap, it could have submitted projects to meet that Relevancy requirement more aptly.

To be clear, this Court is not directing the Air Force to make an award to Plaintiff based on this Court's ruling. In fact, should Defendant decide to go forward with awarding Mini-MACC contracts, Plaintiff could land in the same position after the Air Force performs corrective action consistent with this Memorandum and Order. However, the Court is satisfied that Plaintiff has established the necessary prejudice to demonstrate it would have a "substantial chance" of winning an award. *Off. Design Grp.*, 951 F.3d at 1373–74. Plaintiff has met its burden.

---

[34] For example, the offeror ranked directly above Frawner, Ames 1 (ranked seventh), received a Substantial Confidence rating despite having the same exact Quality ratings as Frawner: two "Very Good" projects, one "Exceptional" project, and two unrated projects. Tab 41 at AR 2581.

II.   Price

Plaintiff next argues that the Air Force's Price analysis was arbitrary, capricious, and unlawful because the agency (1) performed an inadequate price reasonableness analysis, (2) failed to adequately consider Price, reducing it to a "nominal factor,"[35] and (3) conducted an "improper and undocumented" best value tradeoff analysis.  Pl.'s Mem. at 33.  Defendant responds that the agency properly considered Price in both its price reasonableness and best value tradeoff analysis. Def.'s Cross-MJAR at 30.  For the reasons explained below, while this Court finds the Air Force's price reasonableness analysis proper, it holds the best value tradeoff analysis was arbitrary and capricious.

A.   The Air Force Properly Evaluated Price Reasonableness

Plaintiff contends that the Air Force did not conduct a "proper" price reasonableness evaluation as required by FAR 15.404-1(a)(1)[36] because it "failed to adequately establish price reasonableness for three of the four awardees whose prices were 'inconsistent' with the other received offers."  Pl.'s Mem. at 36-37 (referencing Tyonek, Eklutna, and Orion); *see also* FAR 14.408-2(a) ("The contracting officer shall determine that . . . the prices offered are reasonable before awarding the contract. The price analysis techniques in 15.404-1(b) may be used as

---

[35] This argument rests entirely on Plaintiff's other two Price arguments — namely whether the Air Force arbitrarily considered Price in its (i) price reasonableness and (ii) best value tradeoff analyses.  *See* Pl.'s Mem. at 33-36 (arguing that agency failed to adequately consider Price in price reasonableness analysis where it concluded that "all thirteen TEPs were reasonable . . . with no other meaningful analysis," and in best value tradeoff analysis by relying on "Past Performance ratings alone to make the final award decision").  Accordingly, the Court analyzes this claim within its discussion of the sufficiency of the agency's price reasonableness and best value analyses.  *See infra* Discussion Sections II(A) and (B).

[36] "The contracting officer is responsible for evaluating the reasonableness of the offered prices. The analytical techniques and procedures described in this subsection may be used, singly or in combination with others, to ensure that the final price is fair and reasonable. The complexity and circumstances of each acquisition should determine the level of detail of the analysis required."

guidelines. In each case the determination shall be made in the light of all prevailing circumstances."). Specifically, Plaintiff argues that the Air Force's (i) method for conducting its price reasonableness evaluation was insufficient, and (ii) finding of price reasonableness was reached based on a "superficial and conclusory" analysis. Pl.'s Mem. at 36-37. This Court disagrees. As explained below, the Air Force appropriately compared offerors' prices by applying a method endorsed by the FAR and concluded based on its evaluation that the offerors' prices were reasonable. That is sufficient to satisfy the Air Force's obligation to analyze price reasonableness.

     i.   <u>The Air Force Properly Applied the Evaluative Technique It Selected to Analyze Price Reasonableness</u>

Plaintiff first argues that the Air Force should have compared offerors' prices to "other objective criteria" such as "past contract prices or an [Independent Government Cost Estimate]." Pl.'s Mem. at 39. Such analysis is not required by the FAR. Under the FAR, the agency has the discretion to choose its test for conducting a price reasonableness analysis. FAR 15.404-1(b)(2) ("The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price."). One of the "preferred" methods is a "[c]omparison of proposed prices received in response to the solicitation." FAR 15.404-1(b)(2)(i); FAR 15.404-1(b)(3) (identifying "preferred [price reasonableness] techniques"). That is exactly the method the Air Force undertook here, as documented by the SSEB, and adopted by the SSA:

> The price evaluation team reviewed each offeror's Attachment 4 Price Schedule for the seed project to calculate each offeror's [Total Evaluated Price (TEP)]. The evaluation team then assessed the potential for the contracting officer to determine the price to be fair and reasonable. . . . Since multiple competitive proposals were received, the Government used the technique outlined in FAR 15.404-1(b)(2)(i), comparison of proposed prices received in response to the solicitation to establish a fair and reasonable price. To assist in a more thorough analysis of price, the mean was calculated by adding the pricing of all evaluated proposals, then dividing by the total number of evaluated proposals. Each offerors' price was then compared to the mean of all evaluated proposals.

Tab 41 at AR 2566; Tab 44 at AR 2706-07 (description of SSEB's price reasonableness analysis and adoption by SSA of reasonable prices finding).  It is not the role of the Court to second-guess the method chosen by the agency to conduct its price reasonableness analysis, so long as the Air Force conducted a FAR compliant analysis.  *See Serco Inc. v. United States*, 81 Fed. Cl. 463, 495 (2008).  The Air Force's analysis of calculating offerors' TEPs, averaging them, and then comparing the individual prices to the average certainly meets the FAR endorsed test of comparing "prices received in response to the solicitation."  FAR 15.404-1(b)(2)(i).  As the Air Force conducted a price reasonableness test endorsed by the FAR, Plaintiff's complaints about the Air Force's analysis falls short in this regard.

ii.    The Air Force Rationally Determined That Price Competition Existed

Plaintiff next argues that the Air Force erroneously concluded that bidders' submitted prices were reasonable based on an allegedly "superficial and conclusory" analysis and an "unsubstantiated" assumption of price variability in the Anchorage construction market.  Pl.'s Mem. at 37-39.  This Court disagrees.  Frawner's complaints "are nothing more than mere disagreement with the Agency's reasonable exercise of its considerable discretion."  *Vertex Aerospace, LLC v. United States*, No. 20-700C, 2020 WL 5887750, at *10 (Fed. Cl. Sept. 21, 2020).

While "[n]ormally, adequate price competition establishes a fair and reasonable price," agencies perform price reasonableness analyses to "prevent the Government from paying too high a price" for the procurement.  FAR 15.404-1(b)(2)(i); *see IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 406 (2021).  The agency is best suited to assess whether bidders' prices are reasonable.  *Serco.*, 81 Fed. Cl. at 495 ("[T]he depth of an agency's price reasonableness analysis and its ultimate findings on that count are both matters of discretion.").  The Court need only assess

whether the agency acted rationally in making its price reasonableness conclusion.  *Moore's Cafeteria Servs. v. United States*, 77 Fed. Cl. 180, 187 (2007), *aff'd,* 314 F. App'x 277 (Fed. Cir. 2008) (applying a rational basis standard to agency's price reasonableness analysis).  As explained below, this Court finds that the Air Force's price reasonableness conclusion was rational.

The Air Force determined that the particularities of Anchorage construction pricing — which it notes have been exacerbated by COVID-19 sourcing issues — adequately explained the wide variation in proposal prices.  Tab 41 at AR 2568; Tab 44 at AR 2707.  The Court finds this rationale reasonable considering the Air Force's knowledge of the Alaska market, and its observation that while some contractors have their own workforce, others do not, and while some own their own equipment, others will have to lease equipment — all issues especially relevant to the unpredictable Alaska construction market.  Tab 41 at AR 2568; Tab 44 at AR 2707; *Moore's Cafeteria Servs.*, 77 Fed. Cl. at 187.  Further, since the Air Force evaluated prices for the seed project only, the four contract awardees would have to further compete on price for future task orders, increasing competition down the line.  Tab 44 at AR 2706 (noting that "the price being considered here, the TEP, is the proposed price for the seed project for this set of IDIQ contracts"); *see also Tech. Innovation All.*, 149 Fed. Cl. at 142   (finding contracting officer permissibly concluded that prices were reasonable even in the face of wide price variation where the agency justified such variations based on "the complex and unknown nature of the work" and where future competition at the task order level would mitigate any price concerns) (citation omitted).

Plaintiff contends that the Air Force could not base its price reasonableness determination on "unverified and unquantified notion[s] of price regional variability in the Anchorage market" and can only "rely on submitted or verified data and evaluation techniques permitted by the terms of the RFP and applicable law."  Pl.'s Reply at 21.  This position distorts the role of the agency in

the procurement process.  If true, an agency could not use its knowledge and expertise in evaluating

bids.  That is not the case.  Rather, an agency is permitted to use its knowledge and expertise during

the procurement process, including in its evaluation of price reasonableness.  *DynCorp Int'l LLC*

*v. United States*, 139 Fed. Cl. 481, 487 (2018) (deferring to "an agency's expertise in making

procurement decisions"); *see also* Oral Arg. Tr. 35:21-25 (acknowledging on behalf of Plaintiff

that there is a "certain amount of discretion that the Government gets in a FAR Part 15 negotiated

procurement" in which the agency is "supposed to be using [its] expertise").  The Air Force is

familiar with the Anchorage market based on previous contracts it has entered with third parties

for services at JBER.  *See, e.g.*, https://www.asrcfederal.com/asrc-federal-subsidiary-awarded-the-

united-states-air-force-joint-base-elmendorf-richardson-base-operations-maintenance-services-

contract/ (last viewed June 21, 2022).  Accordingly, the Air Force's explanation of price variation

is rational based on (i) the agency's knowledge of the fluctuating Anchorage market, and (ii) the

future competition for task orders among the four winning bidders.  *See Moore's Cafeteria Servs.*,

77 Fed. Cl. at 187; *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 846 (1999) (contracting

officer has "wide discretion" in evaluation of bids).

   iii.   <u>The Air Force Properly Considered Higher Priced Bids in its Price Reasonableness Determination</u>

     Plaintiff also takes issue with the Air Force's finding of reasonable pricing for three of the

award winners — Tyonek, Eklunta, and Orion.  Pl.'s Mem. at 38-39.  Specifically, Plaintiff

complains that Tyonek's TEP exceeded the mean by $469,050.70 or 33.9%, Eklutna's TEP

exceeded the mean by $590,130.70 or 42.0%, and Orion's TEP was $36,324.81 above the mean

and was only compared to Nodak's price.  *Id.* (referencing Tab 44 at AR 2707-08).  The Air Force

provided a rational explanation for why it considered those prices reasonable.  The Air Force found

Orion's price reasonable given its "TEP[] [was] very close to the mean of all offeror[s'] TEPs."

Tab 44 at AR 2708.  Concerning Tyonek and Eklutna — two of the highest-price offerors — the Air Force assessed that "although th[ose] offeror[s'] price[s] [are] substantially higher than other offerors," they were still reasonable because of "extreme variability in prices seen in the past year." Tab 41 at AR 2582 (Eklutna), AR 2602 (Tyonek).  Again, this Court defers to the agency's judgment concerning "extreme [price] variability" in the Anchorage, Alaska market over the prior year.  Tab 41 at AR 2582, AR 2602; *see DynCorp Int'l*, 139 Fed. Cl. at 487.

Finally, Plaintiff relies on *Serco Inc. v. United States*, 81 Fed. Cl. 463 (2008) to argue that future price competition alone is insufficient to establish price reasonableness.  Pl.'s Mem. at 35. This Court agrees that the Air Force cannot base its price reasonableness determination *solely* on future price competition between the Mini-MACC awardees.  However, unlike in *Serco* where the court rejected an agency's price reasonableness finding that relied exclusively on future price competition, here the Air Force relied on *more* than just price competition in concluding that the prices received were reasonable.  *Serco*, 81 Fed. Cl. at 492-93.  As previously noted, the Air Force also based its conclusion on price variability in the Anchorage market — a factor that the agency is best tasked with weighing.  Tab 41 at AR 2568.  Accordingly, Plaintiff's price reasonableness protest fails.

### B.  The Air Force Did Not Perform an Adequate Best Value Tradeoff

Frawner's final protest ground claims that the Air Force performed an inadequate best value tradeoff analysis as required by the FAR and the Solicitation.  Pl.'s Mem. at 40.  Specifically, Plaintiff contends that the Air Force "failed to make any meaningful tradeoff between Frawner's lower-priced proposal and the higher-priced proposals of Orion, Eklutna[,] and Tyonek."  *Id.* at 41; *see also* Oral Arg. Tr. at 68:9-12 ("And these reasons for using these higher-priced offerors make no sense.  There is nothing -- let me take a step back.  They might make sense, but there's

nothing in the record to demonstrate why they do."). This Court agrees. While thorough in several respects, the Air Force's best value tradeoff analysis was arbitrary and capricious as there are material gaps in the SSA's report.

Under FAR 15.101-1, an agency performs a tradeoff analysis between cost and non-cost factors when "it may be in the best interest of the Government to consider [an] award to other than the lowest priced offeror or other than the highest technically rated offeror." FAR 15.101-1(a). Here, the Solicitation required a best value tradeoff analysis using the TEP and Past Performance confidence rating if, as here, the Air Force "award[ed] a contract to other than the lowest price." Tab 8 at AR 391. While an agency's best value determination is entitled to "considerable deference," its analysis must still document the "perceived benefits of the higher priced proposal" relative to its "additional cost." *Serco,* 81 Fed. Cl. at 496; *E.W. Bliss Co.*, 77 F.3d at 449 (holding agency has "substantial discretion to determine which proposal represents the best value for the [G]overnment"); *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) (holding agency has "broad discretion in evaluating proposals in a 'best value' procurement"); FAR 15.101(c); *see also* FAR 15.308 ("The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs."). Thus, "[c]onclusory statements, devoid of any substantive content . . . that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions" and render the analysis irrational. *Serco*, 81 Fed. Cl. at 497. At issue here is the Air Force's failure to properly document those tradeoffs.

Defendant argues that the SSA performed an adequate best value tradeoff analysis by relying on the strength of offerors' Quality ratings to rationalize awarding contracts to higher-

priced bidders.  Def.'s Cross-MJAR at 40-42.  While this Court agrees with Defendant that the agency was permitted to look beyond the overall Past Performance confidence ratings to examine the underlying Quality ratings, the Air Force was still required to document the tradeoffs it made that warranted paying a higher price.  *See Glenn Def. Marine*, 720 F.3d at 909 (holding rational agency's decision to consider sub-factor ratings and narrative comments, rather than just considering overall ratings); *Femme Comp*, 83 Fed. Cl. at 758 ("Looking beyond the adjectival ratings is necessary because proposals with the same adjectival rating are not necessarily of equal quality.") (internal quotation and citation omitted); *see also supra* Discussion Section I(A)(v).

Plaintiff contends the SSA's tradeoff analysis for the second and third rated awardees, Tyonek and Eklutna, insufficiently demonstrates why each was worth the Government paying a premium.  Pl.'s Mem. at 41.  The SSA explained the alleged benefits justifying ranking Tyonek and Eklutna second and third after SD Construction, despite respective prices of 33.9% and 42.0% above the mean, were: (1) "they have higher quality ratings than the offerors identified below as going into the on-ramp pool," and (2) "the need for well-qualified contractors able to provide quality work for the period of this Mini-MACC is worth more to the Government than the risk represented by higher TEPs for the seed project, especially when that seed project will be awarded to a different offeror."  Tab 44 at AR 2707-08.  However, the SSA did not explain or document what the Air Force materially gains other than being able to state that its projects were performed by a higher-rated company.  *Id.*  Plaintiff similarly critiques the tradeoff analysis conducted for the fourth-ranked awardee, Orion.  Pl.'s Mem. at 41-42.  Just as for Tyonek and Eklutna, the Air Force determined that although fifth-ranked Nodak's TEP ($███████) was ████████ fourth-rated Orion's TEP ($1,441,274.11), the agency would award the contract to Orion given its "slightly higher quality" ratings.  Tab 44 at AR 2708-09 (awarding the fourth contract position to

Orion as all four of its rated projects received "Very Relevant" ratings as opposed to Nodak, which had three projects with "Very Relevant" ratings and one project with a "Relevant" rating).

Although the Solicitation indicated that Past Performance weighed significantly more than Price, it is well-established that when making a best value determination, price must still be meaningfully considered and reflected in the SSA's documented analysis. *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993) ("[T]he importance of price in a price/technical tradeoff must not be discounted to such a degree that it effectively renders the price factor meaningless."); *Serco*, 81 Fed. Cl. at 498 (holding best value tradeoff insufficient as it failed to indicate whether "the government would receive benefits commensurate with the price premium it proposed to pay") (citation omitted); Tab 8 at AR 389 (stating that "competing offerors' past performance proposal will be evaluated on a basis significantly more important than price"). The Air Force failed to do so when comparing Past Performance and Price in its best value tradeoff analysis.

The Air Force did not document its rationale for why these additional, "slightly higher" Quality ratings outweighed paying a higher price. *Serco*, 81 Fed. Cl. at 498 ("While the SSA certainly found that a given technical proposal was higher ranked than another, he did not explain whether the relatively minor differences in technical scores evidenced a true technical superiority."); Tab 44 at AR 2708-09. A higher Quality rating could mean that the company's previous projects were more relevant in "scope." Or, it could mean that company's previous projects were more relevant in "magnitude" or "complexity." It could mean that the company had a better history of timely performance. Or, that the company had a better history of regulatory compliance. It is not clear that all these factors are of equal value, and the SSA did not provide adequate documentation of its reasoning. Accordingly, the Air Force should sufficiently document

why these higher Quality rating values were worth paying higher prices, in some cases as much as 30-40% more.  It is not this Court's role at this point to determine whether the tradeoff results would merit a different substantive ranking.  The SSA must provide and document its rationale.

The only rankings for which Defendant clearly documented best value tradeoffs were the highest and lowest ranked offers.  The agency reasonably explained that SD Construction was a better value to the government than Tyonek even though both were, in the SSA's eyes, "essentially equal" with the highest Past Performance and Quality ratings, because SD Construction had the lowest TEP of all offerors.  Tab 44 at AR 2707.  The SSA did not "depart from the model of going strictly by quality ratings" until it came to ranking the two offerors with "Neutral Confidence" ratings.  *Id*. at AR 2710 (HPM and Tikigaq).  There, it reasoned that a 34% price premium was too much to pay for the better past performance rating of Tikigaq because there was essentially no Past Performance with which to compare.  *Id.*  Unlike its analysis for SD Construction and those offerors receiving a Neutral Confidence rating, the decisions to rank Tyonek and Eklutna as the second and third best offers, Orion and Nodak as the fourth and fifth best offers, and the remaining offers, including Frawner's, in the on-ramp, do not include documentation of tradeoffs where higher-priced offerors received a higher rank.  *Id.* at AR 2707-10.  Accordingly, due to such lack of documentation of meaningful price consideration, the best value analysis as it pertains to Frawner is arbitrary and capricious.

### C.   Plaintiff Is Prejudiced by the Air Force's Improper Best Value Tradeoff Analysis

The Air Force's arbitrary and capricious best value tradeoff evaluation prejudiced Frawner. As explained with respect to the Air Force's Past Performance evaluation, there is a "substantial chance" that Frawner would have received an award had its past performance received a "Substantial Confidence" rating.  *Off. Design Grp.*, 951 F.3d at 1373–74; *see also supra*

Discussion Section I(C).  A proper tradeoff evaluation would have only increased that "substantial chance," as Frawner's TEP was the fourth lowest price of the thirteen bids placing it squarely within the "zone of active consideration" for one of the four awards.  *Off. Design Grp.*, 951 F.3d at 1373-74; Tab 44 at AR 2708-09 (Frawner's TEP of $███████).  As this procurement was evaluated on Past Performance and Price, even with Past Performance of greater weight, a very low TEP would weigh in that offeror's favor.  Tab 8 at AR 389.  Accordingly, Plaintiff's protest as it relates to the Air Force's best tradeoff analysis succeeds.

III.   <u>Injunctive Relief and Corrective Action</u>

The Court considers four factors when deciding whether to grant injunctive relief: (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors granting an injunction, and (4) whether the public interest is served by granting an injunction.  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *see also Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 2007) (noting that success on the merits is "the most important factor required to enjoin the award of [a] contract").  As discussed above, Plaintiff's protest succeeds on the merits.  Thus, this Court reviews the other three factors to determine whether injunctive relief is appropriate.

A.   <u>Frawner Will Suffer Irreparable Harm</u>

Frawner will suffer irreparable harm if injunctive relief is withheld.  "A party suffers irreparable harm when there is no adequate remedy" in the absence of an injunction.  *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 575 (2004), *aff'd*, 163 F. App'x 853 (Fed. Cir. 2005).  Courts have recognized that a party suffers irreparable harm when it loses the "opportunity to compete for a contract and secure any resulting profit."  *Id.*  Since Frawner was not a Mini-MACC

awardee, performance under the awarded contracts would deprive Frawner of the ability to fully compete for future task orders under the Mini-MACC. Thus, Frawner will suffer irreparable harm.

### B.   The Balance of Hardships Weighs in Favor of an Injunction

The balance of hardships inquiry requires a "consideration of the harm to the [G]overnment." *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000). Although an injunction may complicate the Air Force's construction efforts during the short Alaskan construction season, that complication is smaller than the harm that Frawner — and other losing bidders — will suffer without an injunction as it would deprive them of the opportunity to compete for the Mini-MACC task orders. Further, as the injunction neither impacts the Air Force's seed project award nor disturbs its Mini-MACC award to SD Construction, the Air Force will have other options to fulfill its construction needs this summer. Accordingly, the balance of hardships weighs in favor of granting an injunction.

### C.   An Injunction Is in the Public Interest

It is axiomatic that "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Overstreet Elec.*, 47 Fed. Cl. at 744. An injunction preventing performance under the arbitrarily and capriciously awarded Mini-MACC contracts will further serve the public interest by preserving "honest, open, and fair competition in the procurement process." *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003). Defendant's argument that an injunction is not in the public interest because this contract "concerns upkeep of Joint Base Elmendorf-Richardson" is unavailing. Def.'s Cross-MJAR at 43. Defendant does not contend that national defense or national security concerns are implicated by an injunction. *Id.*; *see also* 28 U.S.C. § 1491(b)(3) ("In exercising jurisdiction under this subsection, the courts shall give due regard to the interests

of national defense and national security and the need for expeditious resolution of the action.").

Further, even if such concerns were prevalent, the Court accounted for them by allowing the Air

Force to proceed with its award to SD Construction.  Accordingly, the public interest weighs in

favor of an injunction.

       D.  Scope of Injunction

As all four factors weigh in Plaintiff's favor, this Court finds entry of an injunction

appropriate.  Concerning the scope of injunctive relief, the Court enjoins the Air Force from

awarding or proceeding with any award under the Solicitation other than to SD Construction.

"[T]he Court of Federal Claims has broad equitable powers to fashion an appropriate remedy."

*Turner Constr. Co., Inc. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011).  Indeed, the Tucker

Act empowers this Court to "award *any* relief that [it] considers proper."  28 U.S.C. § 1491(b)(2)

(emphasis added).  SD Construction was the clear frontrunner, and the awardee of the seed project,

as reflected by the SSA's report.  Tab 44 at AR 2707 (concluding that "[s]ince SD [Construction]

has the highest quality rating of any offeror (tied with Tyonek) and the lowest TEP, SD has the

offer that is most beneficial to the Government and is the first awardee listed.  SD will also be the

company to which the seed project will be awarded.").  The issues discussed regarding the Air

Force's Past Performance and best value tradeoff evaluations will not change that outcome for SD

Construction as its best performance ratings and lowest price would not be impacted.  *Id.* at AR

2707-09.  Keeping the award in place for SD Construction will also minimize potential disruptions

to maintenance projects planned at JBER during the short Alaskan summer.

Should Defendant opt to continue with the other three awards under the Solicitation, it may

do so under this Court's Order and injunction if it undertakes corrective action consistent with the

following conditions:

First, Defendant shall not treat the "magnitude" sub-factor as a binary factor where Past Performance efforts valued above $2 million receive a "Not Relevant" rating for that sub-factor and Past Performance efforts valued below $2 million receive a "Very Relevant" rating. Rather, Defendant shall, to the extent it applies adjectival ratings to Relevance sub-factors, employ the full range of such ratings as defined in the Solicitation. This is not to say that a project valued at over $2 million cannot be rated as "Not Relevant." A past project valued at $7 million may potentially still receive a "Not Relevant" "magnitude" sub-rating given the significant variance between the maximum task order listed in the Solicitation and the past project's value. However, if the Air Force chooses to rate that past project with a "Not Relevant" "magnitude" sub-rating, it must document the specific reason for doing so, the basis of which cannot be that it was applying an unstated $2 million threshold.

Second, consistent with this Court's ruling, Defendant shall not automatically assign as the overall Relevance rating for a Past Performance effort the adjectival rating of the lowest rated Relevance sub-factor. This means that the Air Force cannot use the lowest of the three Relevance sub-factor adjectival ratings as the automatic, overall Relevance score. Rather, prior to assigning an overall Relevance adjectival rating, the agency should analyze each project's Relevance in its entirety, analyzing all three sub-factors together, consistent with the express terms of the Solicitation. Again, this is not to say that a project with, for example, a "Not Relevant" "magnitude" sub-score and "Relevant" "scope" and "complexity" sub-scores cannot still receive an overall Relevance rating of "Not Relevant;" it may do so as long as that rating is consistent with the Solicitation's language. However, the agency cannot do so merely because it is automatically adopting the lowest of the three sub-factor ratings. The Air Force must document its reason for its rating consistent with the Solicitation's language.

<u>Third</u>, regarding price and best value analysis, to the extent the Air Force concludes that a higher-priced offer presents the best value to the agency due to superior technical aspects reflected in the offeror's past performance rating, it must specifically document those benefits and whether they are worth the price premium.  Merely stating that an offeror has stronger Quality ratings will not suffice.  A fuller explanation is necessary that documents the tradeoffs the Air Force is making.

This ruling does not require the Air Force to adopt a specific ordering of the bids beyond SD Construction should Defendant opt to take corrective action and continue with awards under the Solicitation.  The Air Force has considerable discretion with how it moves forward with any reevaluation consistent with this Court's ruling.  However, it must do so in compliance with the terms of the Solicitation and the applicable provisions of the FAR.

<u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 24) is **GRANTED IN PART** and Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 27) is **DENIED IN PART**.  The Clerk of Court is **DIRECTED** to enter Judgment accordingly.

The parties are directed to **CONFER** and **FILE** a Notice within seven days of this Memorandum and Order, attaching a proposed public version of this Sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.

*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

July 29, 2022
Washington, D.C.